PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

F I L E D
United States Court of Appeals
Tenth Circuit

JAN 4 2002

PATRICK FISHER
Clerk

U.S. WEST COMMUNICATIONS, INC., a Colorado corporation,

    Plaintiff-Appellee,

USA and FEDERAL COMMUNICATIONS COMMISSION,

    Plaintiffs-Intervenors,

v.

SPRINT COMMUNICATIONS COMPANY, L.P., a limited partnership,

    Defendant-Appellant,

ROBERT J. HIX, R. BRENT ALDERFER, and VINCENT MAJKOWSKI, Commissioners of the Public Utilities Commission of the State of Colorado; PUBLIC UTILITIES COMMISSION FOR THE STATE OF COLORADO; TCG COLORADO, a New York General Partnership; TELEPORT COMMUNICATIONS GROUP, INC., a Delaware corporation; ICG TELECOM GROUP, INC., a Colorado corporation; AT&T COMMUNICATIONS OF THE MOUNTAIN STATES, INC., a Colorado corporation; WORLDCOM TECHNOLOGIES, INC., a Delaware corporation; MCI TELECOMMUNICATIONS CORPORATION, a Delaware corporation; MCIMETRO ACCESS TRANSMISSION SERVICES, INC., a Delaware corporation,

    Defendants.

No. 00-1401

U.S. WEST COMMUNICATIONS, INC., a Colorado corporation,

      Plaintiff-Counter-Defendant-Appellee,

USA and FEDERAL COMMUNICATIONS COMMISSION,

      Plaintiffs-Intervenors,

v.                            No. 00-1402

ROBERT J. HIX, R. BRENT ALDERFER and VINCENT MAJKOWSKI, Commissioners of the Public Utilities Commission of the State of Colorado; PUBLIC UTILITIES COMMISSION FOR THE STATE OF COLORADO; TCG COLORADO, a New York General Partnership; TELEPORT COMMUNICATIONS GROUP, INC., a Delaware corporation; ICG TELECOM GROUP, INC., a Colorado corporation; AT&T COMMUNICATIONS OF THE MOUNTAIN STATES, INC., a Colorado corporation; SPRINT COMMUNICATIONS COMPANY, L.P., a limited partnership,

      Defendants,

WORLDCOM TECHNOLOGIES, INC., a Delaware corporation; MCI TELECOMMUNICATIONS CORPORATION, a Delaware corporation; MCIMETRO ACCESS TRANSMISSION SERVICES, INC., a Delaware corporation; MFS INTELENET OF COLORADO, INC., a Delaware corporation,

      Defendants-Counter-Claimants-Appellants.
.

**APPEAL FROM UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 97-D-152)**

David P. Murray, Randy Branitsky, and Kevin M. Miller, Willkie Farr & Gallagher, of Washington D.C., for the appellant Sprint Communications Company L.P.

Terri L. Mascherin, Andrew M. Spangler, Jr., and John J. Hamill, Jenner & Block, LLC, of Chicago, Illinois; and William Single, IV, Brian J. Leske, and Thomas F. O'Neill III, Worldcom, Inc., of Washington D.C., for the appellants MCI Telecommunications Corporation and MCImetro Access Transmission Services, Inc.

Wendy M. Moser and Todd L. Lundy, Qwest Corporation, of Denver, Colorado; B. Lawrence Theis, Perkins Coie LLP, of Denver Colorado; Kara M. Sacilotto, Perkins Coie LLP, of Washington, D.C.; and Kirstin S. Dodge, Perkins Coie LLP, of Bellevue, Washington, for the appellee Qwest Corporation.

Before **BRISCOE, McKAY**, and **HALL,**[1] Circuit Judges.

**BRISCOE**, Circuit Judge.

Plaintiff U.S. West Communications, Inc., now known as Qwest Corporation (Qwest), brought these actions pursuant to 47 U.S.C. § 252(e)(6) to challenge provisions contained in arbitrated interconnection agreements with defendants Sprint Communications Company L.P. (Sprint), MCI Telecommunications Corporation, and MCImetro Access Transmission Services, Inc. (collectively MCI). The district court vacated the provisions, concluding defendant Colorado Public Utilities Commission

---

[1] Honorable Cynthia Holcomb Hall, Circuit Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

3

(CPUC) overstepped its authority and acted contrary to the Telecommunications Act of 1996 in including the provisions in the agreements. Sprint and MCI appeal from that ruling. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, reverse the judgment of the district court, and remand with instructions to enter judgment in favor of Sprint and MCI.

I.

This case arises out of Congress' efforts, through the Telecommunications Act of 1996 (the Act), to increase competition in the market for local telephone service. In AT&T Corp. v. Iowa Utilities Bd., 525 U.S. 366 (1999), the Supreme Court briefly outlined the history of local telephone service, the impact of the Act on such service, and the methods by which the Act allows new companies to gain entry to a local market:

> Until the 1990's, local phone service was thought to be a natural monopoly. States typically granted an exclusive franchise in each local service area to a local exchange carrier (LEC), which owned, among other things, the local loops (wires connecting telephones to switches), the switches (equipment directing calls to their destinations), and the transport trunks (wires carrying calls between switches) that constitute a local exchange network. Technological advances, however, have made competition among multiple providers of local service seem possible, and Congress recently ended the longstanding regime of state-sanctioned monopolies.
> The Telecommunications Act of 1996 (1996 Act or the Act), Pub.L. 104-104, 110 Stat. 56, fundamentally restructures local telephone markets. States may no longer enforce laws that impede competition, and incumbent LECs are subject to a host of duties intended to facilitate market entry. Foremost among these duties is the LEC's obligation under 47 U.S.C. § 251(c) (1994 ed. Supp. II) to share its network with competitors. Under this provision, a requesting carrier can obtain access to an incumbent's network in three ways: It can purchase local telephone services at wholesale

4

rates for resale to end users; it can lease elements of the incumbent's network "on an unbundled basis"; and it can interconnect its own facilities with the incumbent's network. When an entrant seeks access through any of these routes, the incumbent can negotiate an agreement without regard to the duties it would otherwise have under § 251(b) or § 251(c). See § 252(a)(1). But if private negotiation fails, either party can petition the state commission that regulates local phone service to arbitrate open issues, which arbitration is subject to § 251 and the FCC regulations promulgated thereunder.

Id. at 371-73 (footnotes omitted).

The Act imposes three general conditions a state commission must satisfy in arbitrating open issues regarding an interconnection agreement. First, it must "ensure that [its] resolution and conditions meet the requirements of section 251 . . ., including the regulations prescribed by the [FCC] pursuant to section 251."[2] 47 U.S.C. § 252(c)(1). Second, it must "establish any rates for interconnection, services, or network elements according to subsection (d) of [section 252]," id. § 252(c)(2), which provides that interconnection and network element charges "shall be . . . based on the cost . . . of providing the interconnection or network element, and . . . nondiscriminatory, and . . . may include a reasonable profit." Third, it must "provide a schedule for implementation of the terms and conditions by the parties to the agreement." Id. § 252(c)(3). As long as these three requirements are satisfied, a state commission is free, subject to the provisions

---

[2] Section 251, entitled "Interconnection," imposes a variety of duties on telecommunications carriers in general, and local exchange carriers in particular, including the duty to "interconnect" with each other. The apparent purpose of the section, consistent with the Act's goal of increasing competition, is to smooth entry of new carriers into the market for local phone service.

of 47 U.S.C. § 253,[3] to "establish[] or enforc[e] other requirements of State law in its review of an [interconnection agreement], including requiring compliance with intrastate telecommunications service quality standards or requirements." 47 U.S.C. § 252(e)(3).

Once an interconnection agreement is arbitrated, it must be submitted to the state commission for final approval. See 47 U.S.C. § 252(e)(1). A state commission may reject an arbitrated agreement only if the agreement or a provision thereof fails to meet the requirements of section 251 of the Act or the FCC regulations promulgated under the Act. See 47 U.S.C. § 252(e)(2)(B).

Finally, the Act provides for federal court review of interconnection agreements. Specifically, 47 U.S.C. § 252(e)(6) authorizes "any party aggrieved by" a state commission decision regarding an interconnection agreement to "bring an action in an appropriate Federal district court." For example, if a party to an arbitrated interconnection agreement is dissatisfied with a particular provision imposed by a state commission, it can seek review of that provision by filing suit in federal court. Federal court review is limited to the determination of whether the agreement "meets the requirements of section 251 . . . and . . . section [252]." Id.

---

[3] Section 253, entitled "Removal of barriers to entry," generally provides that "[n]o State or local statute or regulation, or other State or local legal requirements, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a).

*History of interconnection agreements and ensuing litigation*

Plaintiff Qwest is an incumbent local exchange carrier (ILEC) based in the state of Colorado. MCI and Sprint, along with several other companies, sought entry to Qwest's market for local phone service. Under the Act, these companies are generally referred to as "competing local exchange carriers" (CLECs). MCI and Sprint each attempted, unsuccessfully, to negotiate interconnection agreements with Qwest. Accordingly, MCI and Sprint each filed a petition with the CPUC asking for arbitration of unresolved issues with Qwest. In particular, both MCI and Sprint sought inclusion in their respective interconnection agreements of "most favored nation" (or "pick and choose") clauses affording them the right to (1) pick any clause from any other interconnection agreement either agreed to or arbitrated by any other carrier who interconnected with Qwest, and (2) purchase services from Qwest out of any effective tariffs filed by Qwest with the CPUC,[4] regardless of the price(s) otherwise established for such services in the parties' interconnection agreement. Dist. Ct. Order at 26.

*CPUC's decision regarding MCI's petition*

MCI's petition, which was filed first, was addressed by the CPUC in a written

---

[4] As a local exchange carrier, Qwest is subject to the "jurisdiction, control, and regulation" of the CPUC. Colo. Rev. Stat. § 40-1-103(1)(a) (2000). It is uncontroverted that Qwest is required by Colorado law to file tariffs disclosing the prices and terms for its services.

order issued on December 2, 1996.  The CPUC agreed with MCI regarding the most-favored-nation provision and ordered that the interconnection agreement between MCI and Qwest include a provision allowing MCI (1) "to incorporate and use any interconnection, service, or network element from another agreement, upon acceptance of all of the terms and conditions in the agreement related to such interconnection service or element," and (2) "to purchase services out of an effective tariff, regardless of prices set forth in an existing agreement."  MCI App. at 366.  The CPUC concluded the first portion of the provision was required by Section 252(i) of the Act (47 U.S.C. § 252(i)) and FCC Rule 809, which implemented Section 252(i).  The CPUC concluded the second portion of the provision (i.e., the tariff opt-in portion) was "consistent with the Act and [Qwest's] common carrier obligations."  Id.  More specifically, the CPUC agreed with MCI that it "would be unable to fairly compete in serving end-users if it [wa]s required to purchase services from [Qwest] at unfavorable rates or on less favorable terms and conditions as compared to other providers."[5]  Id.

After the CPUC issued its decision, the Eighth Circuit vacated FCC Rule 809, the regulation implementing Section 252(i) of the Act.  See Iowa Utilities Bd. v. FCC, 120

_____

[5]  Interestingly, Qwest argued, in response to MCI's petition, that in the event the CPUC ordered the inclusion of a most-favored-nations provision, the CPUC should "develop standardized, tariff-like offerings for interconnection agreements."  MCI App. at 364-65.  The CPUC concluded that such a system was already in place, since its rules required incumbent providers "to file tariffs establishing rates, terms, and conditions for interconnection, termination of local traffic, and unbundled elements."  Id. at 367.

F.3d 753, 816 (8th Cir. 1997), <u>aff'd in part, rev'd in part sub nom.</u> <u>AT&T Corp v. Iowa</u>

<u>Utilities Bd.</u>, 525 U.S. 366 (1999). Accordingly, pursuant to Qwest's petition for

reconsideration, the CPUC modified the most-favored-nation provision by striking all

references to MCI's right to incorporate terms from other interconnection agreements.

The CPUC subsequently approved the arbitrated interconnection agreement between MCI

and Qwest, which included the following most-favored-nation provision:

> The provisions of Section 252(i) of the Act shall apply to this Agreement, including state and federal interpretive regulations in effect from time to time. In the event any governmental authority or agency permits [Qwest], via tariff, to provide any service covered by this Agreement in accordance with any terms or conditions that individually differ from one or more corresponding terms or conditions of this Agreement, [MCI] may elect to amend this Agreement to reflect any such differing terms or conditions contained in such tariff, with effect from the date [MCI] makes such election and for the remainder of the term of this Agreement. The other services covered by this Agreement and not covered by such decision or order shall remain unaffected and shall remain in full force and effect. Notwithstanding the foregoing, [MCI] may purchase services out of an effective tariff, regardless of prices set forth in an existing agreement.

MCI App. at 451.


*CPUC's decision regarding Sprint's petition*

Sprint's petition was addressed initially by an arbitrator. The arbitrator agreed

with Sprint and ordered, in pertinent part, that the interconnection agreement between

Sprint and Qwest "permit Sprint to purchase services out of an effective tariff, regardless

of prices set forth in [the] existing agreement." Sprint App. at 100. The arbitrator

9

concluded that this provision was "consistent with the Act and [Qwest's] common carrier obligations, and with other Commission orders." Id. More specifically, the arbitrator "agree[d] with [Sprint] that a CLEC would be unable to fairly compete in serving end users if it [wa]s required to purchase services from [Qwest] at unfavorable rates or on less favorable terms and conditions as compared to other providers." Id. The arbitrator's decision was consistent with the CPUC's decision on MCI's petition, which was issued approximately one week prior to the arbitrator's decision.

Qwest filed exceptions to the arbitrator's decision, triggering review by the CPUC itself. In particular, Qwest challenged the portion of the arbitrator's decision requiring inclusion of the "most favored nation" clause. On January 8, 1997, the CPUC issued an order rejecting Qwest's exception to the "most favored nation" clause. Id. at 111. In doing so, the Commission concluded that the arbitrator's "Recommended Decision . . . correctly ruled upon th[e] issue for the reasons stated therein." Id. at 117. The CPUC subsequently approved the negotiated/arbitrated interconnection agreement between Sprint and Qwest, effective July 3, 1997. Id. at 127.

Consistent with the CPUC's decision, the interconnection agreement between Sprint and Qwest included the following most-favored-nation provision:

> [Qwest] shall make available any interconnection, service, or network element provided under an agreement approved under Section 252(i) of the Act to which it is a party to Sprint upon the same terms and conditions as those provided in the agreement. Individual interconnection, service, or network elements from another agreement, are available upon acceptance of all the terms and conditions in the agreement related to such

10

interconnection, service or element. Upon proof provided by [Qwest] that Sprint causes [Qwest] to incur greater costs in the provision of the service than the current carrier's agreement, Sprint will accept the increased costs for the service. [Qwest] shall also permit Sprint to purchase services out of an effective tariff, regardless of prices set forth in an existing agreement. [Qwest] shall make all agreements available for public viewing within 10 days of approval by the Commission. Sprint will notify [Qwest] of its intent to adopt the provisions of another agreement at least 30 days prior to effectuating the change.

Dist. Ct. Order at 28 (citing Sprint Interconnection Agreement, Section 36.2).

*District court proceedings*

Qwest, acting pursuant to 47 U.S.C. § 252(e)(6), filed separate actions challenging the CPUC's decisions on MCI's and Sprint's petitions. With respect to the Sprint interconnection agreement, Qwest initially opposed the "most-favored-nation" clause in its entirety. However, following the Supreme Court's decision in Iowa Utilities Bd., Qwest narrowed its challenge to only the portion of the provision affording Sprint the right to purchase services out of Qwest's Colorado tariffs.[6] Qwest's actions were consolidated by the district court for decision.

The district court ultimately agreed with Qwest and concluded that neither the Act nor the FCC rules promulgated pursuant to the Act "permit[ted] a requesting carrier to opt

---

[6] In Iowa Utilities Bd., the Supreme Court reversed the decision of the Eighth Circuit and upheld the FCC's "pick and choose" rule, thereby validating the portion of the "pick and choose" provision which afforded Sprint the right to "opt-in" to any provision contained in any other interconnection agreement between Qwest and other CLECs. 525 U.S. at 395-96.

11

into tariff provisions." Dist. Ct. Order at 30. The district court further concluded that allowing MCI and Sprint "to use a tariff to supplement or supplant any term, condition, or price that is covered by the agreement . . . would eviscerate the provisions of 251 and 252 of the Act which require that the parties negotiate the terms of an interconnection agreement and arbitrate those terms that they are not able to agree to." Id. More specifically, the district court concluded there would be little incentive for carriers such as MCI and Sprint "to negotiate" if they could "simply opt into a more favorable tariff than the state commission imposes." Id. at 31. The court also expressed concern that permitting carriers such as MCI and Sprint to pick and choose from tariffs could "undermine federal court review of interconnection obligations under the . . . Act." Id. Lastly, the court noted that if MCI and Sprint or other similarly-situated carriers wanted "to have a tariff term incorporated into the[ir] interconnection agreements, they [we]re free to seek an amendment of the[ir] interconnection agreement[s]." Id. at 33. The district court therefore vacated the "pick and choose" provisions of the agreements to the extent they permitted MCI and Sprint to purchase services at tariff rates.[7] Id.

---

[7] Shortly after the district court's decision was issued, the interconnection agreement between Sprint and Qwest expired and was replaced by a new agreement (the 2000 Agreement), which is currently in effect. Notably, the 2000 Agreement expressly anticipates the continuation of this litigation and provides that, in the event this court reverses the district court's decision, the parties will amend the 2000 Agreement to reflect the court's decision. See 2000 Agreement, ¶ (A) 1.2. Based upon this language, we conclude that the expiration of the original interconnection agreement did not moot Sprint's appeal. See International Bhd. of Teamsters v. Southwest Airlines Co., 875 F.2d 1129, 1132-33 (5th Cir. 1989) (en banc) (concluding expiration of collective bargaining

12

II.

We review de novo whether the arbitrated interconnection agreements are in compliance with the Act and the implementing FCC regulations. Southwestern Bell Tel. Co. v. Brooks Fiber Comm. of Okla., Inc., 235 F.3d 493, 498 (10th Cir. 2000). All other issues, including state law determinations made by the CPUC, are reviewed under an arbitrary and capricious standard. Id.

III.

*Sprint's Appeal (Case No. 00-1401)*

The primary question we must address is whether the tariff opt-in provision violates § 252(i) and/or the FCC's implementing regulation, 47 C.F.R. § 51.809. Section 252, as its title indicates, generally outlines the "[p]rocedures for negotiation, arbitration, and approval of [interconnection] agreements." Section 252(i), entitled "Availability to other telecommunications carriers," provides:

> A local exchange carrier shall make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement.

47 U.S.C. § 252(i). In turn, FCC Rule 51.809 provides:

> (a) An incumbent LEC shall make available without unreasonable

---

agreement that precipitated suit did not render proceedings moot because parties had negotiated a new agreement that tracked the terms of the original agreement and the parties did not bargain about or agree to a resolution to the dispute).

13

delay to any requesting telecommunications carrier any individual interconnection, service, or network element arrangement contained in any agreement to which it is a party that is approved by a state commission pursuant to section 252 of the Act, upon the same rates, terms, and conditions as those provided in the agreement.  An incumbent LEC may not limit the availability of any individual interconnection, service, or network element only to those requesting carriers serving a comparable class of subscribers or providing the same service (i.e., local, access, or interexchange) as the original party to the agreement.

(b) The obligations of paragraph (a) of this section shall not apply where the incumbent LEC proves to the states commission that:

(1) The costs of providing a particular interconnection, service, or element to the requesting telecommunications carrier are greater than the costs of providing it to the telecommunications carrier that originally negotiated the agreement, or

(2) The provision of a particular interconnection, service, or element to the requesting carrier is not technically feasible.

(c) Individual interconnection, service, or network element arrangements shall remain available for use by telecommunications carriers pursuant to this section for a reasonable period of time after the approved agreement is available for public inspection under section 252(f) of the Act.

47 C.F.R. § 51.809 (2000).

The district court concluded that § 252(i) and the implementing regulation "govern only a requesting carrier's ability to opt into interconnection agreements entered into under the Act."  Dist. Ct. Order at 29.  Proceeding further, the district court interpreted § 252(i) and the implementing regulation as precluding a state commission from allowing a CLEC to opt into the prices and terms set forth in an ILEC's published tariffs.  In other words, the district court interpreted Section 252(i) as governing the entire universe of so-called "opt-in" provisions, and concluded that, because "[a] tariff is not 'an agreement approved under' Section 252," nor "part of the Section 252 negotiation and arbitration

14

process," it violates § 252(i) if a CLEC is allowed to opt into one or more of an ILEC's tariffs. Id. at 29.

We reject the district court's interpretation of § 252(i). Nothing in the language of § 252(i) suggests that it was intended to govern the entire universe of "opt-in" provisions. See generally Iowa Utilities Bd., 525 U.S. at 394 (holding that the Act's language requiring incumbent carriers to "provide such unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service" indicates that network elements may be leased in discrete parts, but "does not say, or even remotely imply, that elements must be provided only in this fashion and never in combined form"); Illinois Bell Tel. Co. v. Worldcom Tech., Inc., 179 F.3d 566, 573 (7th Cir. 1999) (noting that simply because "the Act does not *require*" something does not mean "that it *prohibits* it") (italics in original). Rather, the language of § 252(i) indicates it was intended only to make clear that, under the Act, ILECs are required to allow CLECs to opt into provisions in other interconnection agreements. In other words, § 252(i) allows a CLEC to effectively amend its own interconnection agreement by taking advantage of more favorable provisions contained in other CLEC interconnection agreements. As Sprint argues, the provision, by allowing CLECs to purchase services at equal prices and on equal terms, enables a CLEC to remain competitive with other CLECs in the local market. The provision does not, however, address the ability of a CLEC to remain competitive with an ILEC (which appears to be

15

the intended purpose of the tariff opt-in provision).[8]

The next question is whether the tariff opt-in provision violates any other portions of §§ 251 or 252. The district court concluded that allowing Sprint "to use a tariff to supplement or supplant any term, condition, or price that is covered by the agreement . . . would eviscerate the provisions of [sections] 251 and 252 . . . which require that the parties negotiate the terms of an interconnection agreement and arbitrate those terms that they are not able to agree to." Dist. Ct. Order at 30. Qwest agrees, and also asserts that the provision violates §§ 251 and 252 because, by affording Sprint the right to purchase services out of Qwest's tariffs, it effectively bypasses the parties' interconnection agreement.

The district court concluded that the tariff opt-in provision violated §§ 251 and 252 because, in the district court's view, it had the potential to negatively impact the negotiation of interconnection agreements. According to the district court, "there is little incentive for carriers to negotiate if they can simply opt into a more favorable tariff than the state commission imposes." Dist. Ct. Order at 31.

We question the district court's conclusion. At least from the standpoint of a CLEC,[9] an incentive remains to negotiate prices and terms that are more favorable than

---

[8] We also note that it makes no sense to conclude that § 252(i) precludes a CLEC from opting into an ILEC's tariffs when that precise result can be achieved by a CLEC simply opting into another interconnection agreement that incorporates the ILEC's tariffs.

[9] As the FCC has recognized, ILECs have always had "little incentive to facilitate the ability of new entrants . . . to compete against them." MCI's Opening Br. at 15

16

those set forth in an ILEC's existing tariffs (assuming it is legally permissible for the parties to an interconnection agreement to negotiate prices and terms that are more favorable than those contained in the ILEC's existing tariffs).[10] The tariff opt-in provision therefore does not diminish the negotiation process, but instead ensures that a CLEC will be able to obtain the most favorable prices and terms available, thereby allowing it to remain competitive in the local marketplace.

In concluding that the tariff opt-in provision would negatively impact the negotiation of interconnection agreements, the district court relied on MCI Telecommunications Corp. v. GTE Northwest, Inc., 41 F. Supp. 2d 1157 (D. Or. 1999). That case, however, is not on point. In MCI Telecommunications, the Oregon Public Utility Commission (OPUC) ordered an ILEC to publish a tariff listing elements that the OPUC decided must be unbundled and the prices that the OPUC had fixed for those elements. The effect of the OPUC's order was to allow prospective CLECs to order services from the ILEC "off-the-rack" without entering into an interconnection agreement with the ILEC. The ILEC challenged the OPUC's order and the district court struck it down, concluding it conflicted with the Act and was therefore preempted. Id. at 1176.

_____

(quoting from the FCC's Local Competition Order ¶ 307). The tariff opt-in provisions would seem to have little impact in that area.

[10] MCI, Sprint and Qwest agree that, under Colorado law, a CLEC has the right to purchase services from an ILEC pursuant to the ILEC's tariffs without negotiating an interconnection agreement. Thus, a CLEC already has little incentive to negotiate an interconnection agreement unless it can obtain rates and terms that are more favorable than those found in the ILEC's tariffs.

17

The basis for the district court's decision was its conclusion that the challenged order "dispensed with the interconnection agreement altogether and [wa]s allowing CLECs to order services 'off the rack' without an interconnection agreement." Id. at 1178. That is not the case here, where Sprint and the other CLECs have in place interconnection agreements with Qwest.

Although Qwest repeatedly asserts that the tariff opt-in provision allows Sprint to bypass its interconnection agreement, we disagree. The fact is that the CPUC is imposing an alternative price/term scheme as part of the interconnection agreements. Thus, under the terms of the interconnection agreement, Sprint can purchase services at specific rates and terms listed in its interconnection agreement, or, alternatively, can purchase services at the rates and terms set forth in Qwest's tariffs. Either way, Sprint is acting through its interconnection agreement and with the approval of the CPUC.

One of the main cases relied on by Qwest in support of its "bypass" argument, Verizon North v. Strand, 140 F. Supp. 2d 803 (W.D. Mich. 2000), is inapposite. There, the plaintiff, an ILEC, was challenging a state commission order that required it "to file tariffs offering its network elements and services for sale on fixed terms to all potential entrants without the necessity of negotiating an interconnection agreement." Id. at 809. In other words, the tariff the plaintiff was ordered to file would "completely displace[] . . . interconnection agreement[s]." Id. Here, in contrast, the challenged provision does not eliminate interconnection agreements, but rather is a part of one. A decision by MCI or

18

Sprint to purchase services at the rates and terms set forth in one or more of Qwest's tariffs does not result in abandonment of the interconnection agreement between itself and Qwest. It simply means that the interconnection agreement is amended to include the terms of the particular tariff(s). The parties remain bound by the interconnection agreement at all times, as anticipated by the Act.

In striking the tariff opt-in provision, the district court also expressed concern that the provision could undermine federal court review of interconnection obligations:

> [P]ermitting CLECs to "pick and choose" from tariff provisions may undermine federal court review of interconnection obligations under the Telco Act. The CPUC in other proceedings in this Court, U S West Communications, Inc. v. ICG Telecom Group, Inc., Civil Action No. 99-D-1827, has taken the position that interconnection agreements and the approval or rejection of same are the only thing subject to review in federal court under 47 U.S.C. § 252(e)(6). If the CPUC's argument were accepted, the CPUC and/or other carriers could not be sued in federal court for review of interconnection tariffs that were opted into by a CLEC, essentially eviscerating federal court review of interconnection obligations under the Act. The CPUC could simply purport to apply the Act in a tariff and/or the CLECs could opt into more favorable provisions in a tariff to avoid the exclusive federal court review Congress envisioned.

Dist. Ct. Order at 31. In our view, the district court's concerns are unfounded. In a case decided after the district court's decision, we held that state commissions have inherent authority to interpret and enforce previously-approved interconnection agreements, and that federal courts have jurisdiction to review state commission decisions interpreting and enforcing previously-approved interconnection agreements. Brooks Fiber, 235 F.3d at 497. Thus, if Sprint chooses to exercise its rights under the tariff opt-in provision to

19

purchase services at the rates and terms set forth in Qwest's Colorado tariffs, Qwest can ask the CPUC to review the effectively amended interconnection agreement to ensure that it complies with the terms of the Act. In turn, any of the parties can then seek federal court review of the CPUC's decision.[11]

Additionally, even if federal courts do not have authority to review state commission decisions interpreting and enforcing interconnection agreements, it is clear that state courts do. See Bell Atlantic, 240 F.3d at 307. Thus, Qwest would not be left without an avenue to assert subsequent challenges to the interpretation and enforcement

---

[11] We recognize there is a split of authority among the circuits on the issue of whether federal courts have authority to review state commission orders interpreting and/or enforcing previously approved interconnection agreements. The Fifth, Seventh, Eighth, and Tenth Circuits agree that federal courts have authority to review such orders. See Southwestern Bell Tel. Co. v. Public Utility Comm'n, 208 F.3d 475, 481 (5th Cir. 2000); Illinois Bell, 179 F.3d at 570; Iowa Utilities Bd., 120 F.3d at 804 n.24; Brooks Fiber, 235 F.3d at 497. In contrast, the Fourth Circuit recently held that such orders "are routine State commission determinations made by State commissions within their retained powers, and accordingly they are reviewable only by State courts in accordance with State law that the 1996 Act has preserved." Bell Atlantic Maryland, Inc. v. MCI Worldcom, Inc., 240 F.3d 279, 307 (4th Cir. 2001). As noted by MCI and Sprint, the Supreme Court has granted certiorari in a couple of these cases and will presumably decide the issue sometime this year. See Illinois Bell, 179 F.3d 566, petition for cert granted in part sub nom. Mathias v. WorldCom Techs., Inc., No. 00-878 (Mar. 5, 2001).

Even assuming, arguendo, that the Supreme Court reverses our decision in Brooks Fiber and holds that federal courts do not have jurisdiction to review State commission orders interpreting and enforcing previously approved interconnection agreements, the concerns expressed by the district court appear to be minimal. Presumably the CPUC, in approving the tariff opt-in provision at issue, concluded that it generally complied with the provisions of §§ 251 and 252, and that, should Sprint exercise its rights under the provision to opt into any of Qwest's tariffs, the prices and terms received by it under those tariffs would likewise comply with the Act.

20

of the agreement. Specifically, it appears that Qwest could seek relief in the Colorado courts, and those courts would have authority to determine whether the interconnection agreement complies with the Act. See generally Colo. Rev. Stat. § 40-6-115(1) (2000) (authorizing state court review of any final decision of the CPUC).

The only additional argument Qwest makes on this issue is that "federal court review over state interconnection tariffs is not settled." Qwest Br. (in the Sprint appeal) at 21. Qwest's point is not clear. To the extent a federal court is required to pass on a tariff opt-in provision, it is only determining whether the provision complies with the Act. It is not, as Qwest would have it, passing on the legitimacy of the tariffs themselves. In any event, Qwest readily admits "that parties can agree to incorporate the rates, terms, and conditions of Colorado tariffs in their interconnection agreements." Id. at 6. If that is the case, it is unclear why it was improper for the CPUC in this case to allow Sprint to take advantage of the rates and terms set forth in Qwest's tariffs.

*MCI's Appeal (Case No. 00-1402)*

The issues raised in MCI's appeal are identical to those raised in Sprint's appeal, with one exception. The most-favored-nation provision in the interconnection agreement between MCI and Qwest, in addition to affording MCI the right to permanently amend its interconnection agreement with terms and conditions contained in Qwest's tariffs, states that MCI may also "purchase services out of an effective . . . tariff, regardless of prices

21

set forth in an existing agreement." MCI App. at 362. At first glance, this clause appears problematic since it seems to suggest that MCI can operate outside the terms of its interconnection agreement. Upon closer inspection, however, that is not the case. Instead, the clause allows MCI to temporarily "opt into" Qwest's tariffs, without permanently amending its interconnection agreement to include the tariff rates and terms. In other words, the most-favored-nation provision, considered as a whole, allows MCI to take advantage of Qwest's tariffs in one of two ways: it can either permanently or temporarily "opt into" terms and conditions contained in those tariffs. Either way, MCI remains bound by its agreement with Qwest.

One other aspect of MCI's appeal must be briefly addressed. In challenging the district court's conclusion that the tariff opt-in provision would undermine negotiations of interconnection agreements, MCI contends that, "[u]nder the Act, interconnection agreements are not intended to be the sole means for competing carriers to obtain interconnection, access, or services." MCI's Opening Br. at 27. We find it unnecessary to decide this question because, even if interconnection agreements are the sole means for competing carriers to obtain interconnection, access, or services, nothing in the most-favored-nation provision changes that. The fact is that, however MCI utilizes the most-favored-nation provision, it is acting through the interconnection agreement arbitrated and approved by the CPUC. Further, for the reasons outlined above, we conclude the tariff opt-in provision does not undermine the negotiation process.

22

IV.

The judgment of the district court is REVERSED and the case is REMANDED to the district court with directions to enter judgment in favor of defendants Sprint and MCI.