LAW OFFICES OF CURTIS V. TRINKO, L.L.P., individually and on behalf of all others similarly situated, Plaintiff–Appellant,

v.

**BELL ATLANTIC CORPORATION,** Defendant–Appellee.

**Docket No. 01–7746.**

United States Court of Appeals, Second Circuit.

Errata Filed: July 15, 2002.

Aug. 30, 2002.

For Majority Opinion, see 305 F.3d 89.

SACK, Circuit Judge, concurring in part and dissenting in part.

I concur with the majority's resolution of the plaintiff's appeal with respect to its claims under § 2 of the Sherman Act and § 202 of the Communications Act. I write briefly and separately to make an observation as to these. I respectfully dissent, however, with regard to the majority's dis-

position of the appeal of the dismissal of the plaintiff's claim under § 251 of the Telecommunications Act, which I would remand to the district court for further consideration.

## I. The Sherman Act Claim

I concur with the majority's disposition of the appeal with respect to the antitrust claim. I write separately to emphasize the extent to which, in my view, the procedural posture of the case may influence the outcome of this appeal.

The plaintiff alleges in its amended complaint that:

> Throughout the [relevant p]eriod, [the defendant] has not afforded [competing local exchange carriers ("CLECs")] access to the local loop on a par with its own access. Among other things, [the defendant] [1] has filled orders of CLEC customers after filling those for its own local phone service, [2] has failed to fill in a timely manner, or not [sic] at all, a substantial number of orders for CLEC customers substantially identical in circumstances to its own local phone service customers for whom it has filled orders on a timely basis, and [3] has systematically failed to inform CLECs of the status of their customers' orders with [the defendant].

Am. Compl. at ¶ 21. The plaintiff further alleges:

> On March 9, 2000, after Plaintiff retained counsel to investigate and pursue its claim, [the defendant] agreed to pay a $3 million fine to the U.S. Treasury pursuant to a consent decree entered into between [the defendant] and the Federal Communications Commission arising out of [the defendant's] failure to provide adequate access to Local Phone Service competitors in New York to the level required when the Federal Communications Commission allowed [the defendant] to offer long-distance telephone service to New Yorkers and to pay $10 million in compensation to competing Local Phone Service providers in New York for injury caused to them as a result of [the defendant's] misconduct in handling orders from such competing Local Phone Service providers.

Am. Compl. at ¶ 22. Elsewhere in its amended complaint, the plaintiff asserts that the defendant's conduct injured it. Am. Compl. ¶ 23.

Additionally, in its original complaint, in connection with its allegations concerning Section 251 of the Telecommunications Act, the plaintiff made allegations, parallel to those contained in ¶¶ 21 and 22 of the amended complaint, Compl. ¶¶ 31, 32, consisting of quotations of "obligations" imposed on incumbent local exchange carriers ("ILECs") under the Act, and assertions that the defendant did not fulfil these "obligations."

The defendant responds, however, that this litigation is about only a single sequence of events referred to in the third clause of paragraph 21 and in paragraph 22 of the amended complaint and similar allegations in the original complaint. As the defendant describes these events:

> In the weeks that followed the approval of the New York long-distance application, [the defendant] encountered a problem with the computer systems it adopted (the "operation support systems" or "OSS") to satisfy the regulators' demands during the long-distance-approval process. The problem affected the ability of competitors who had placed orders with [the defendant] to receive an electric confirmation notification that their orders were being processed. AT&T and others immediately filed complaints with the FCC and with the New York PSC. On March 9, 2000,

the defendant entered a consent decree with the FCC resolving the matter by ensuring prompt cure of the problem and payment of $3 million to the United States and $10 million to AT&T and other competitors for their losses.... Just a few months later, in July 2000, with the problem fixed, the FCC dissolved the consent decree.

Appellee's Br. at 9; *see also In the Matter of Bell Atlantic,* 15 F.C.C.R. 5413, 2000 WL 571154 (2000) (consent decree).

The defendant thus insists that this case concerns a computer malfunction that led to a failure to confirm orders by AT&T to the defendant, and no more. The defendant further underscores the fact that it has already paid ten million dollars to CLECs, including AT&T, to compensate them for the injury that they suffered as a result, and $3 million to the FCC as a sanction for any misconduct for which the defendant is responsible. If indeed the plaintiff's claim rests only on the order confirmation failure, and the evidence shows that service lapses were temporary and a consequence of technical flaws alone, it may be that summary judgment will ultimately be available to the defendant on the Sherman Act claim. Evidence of service lapses, absent other indicia of predatory conduct, may not be enough to establish an attempt to injure competition or gain a competitive advantage.

But the district court dismissed the complaint under Fed.R.Civ.P. 12(b)(6) for "failure to state a claim upon which relief can be granted," and it is premature to conclude that the plaintiff cannot establish that the failure to provide prompt order confirmations was not a technical problem, but rather an attempt to fend off competition in the local service market from AT&T or other CLECs. It is also too early to be sure that the plaintiff cannot establish that, independent of confirmation delays, the defendant delayed filling orders of CLECs' customers, but not those of its own customers, or failed to fill orders for CLECs' customers at all, thus injuring competition or gaining a competitive advantage, as the plaintiff also alleges. Should the plaintiff be able to establish the existence of such circumstances, I see no bar to its Sherman Act claim.

Upon a Rule 12(b)(6) motion, dismissal is not warranted unless "no relief could be granted under *any* set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (emphasis added); *accord In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 69 (2d Cir. 2001). Relief can be awarded in this case under a set of facts consistent with the allegations in the complaint, even if the existence of those facts may seem somewhat doubtful.

## II.   Section 251 of the Telecommunications Act

I find the majority's approach to the plaintiff's § 251 claim, majority opinion, 305 F.3d 89, 101, generally well thought out and well articulated, and agree that the district court's resolution of the issue was erroneous. But the ground on which the majority affirms the judgment of the district court is different from that relied upon by the district court and those discussed by the parties on appeal. As far as I can determine, moreover, no other circuit has considered this precise question. Especially in light of the fact that the plaintiff's other claims are being returned to the district court, I would return the § 251 claim for further exposition by the parties and consideration by that court.

The § 251 claim is set forth only in the plaintiff's original complaint. As noted previously, part of the plaintiff's pleading

in this regard is a verbatim recitation of the defendant's "[o]bligations [as a] local exchange carrier[ ]" under § 251(b), and its "[a]dditional obligations [as an] incumbent local exchange carrier[ ]" under § 251(c). Compl. at ¶¶ 45–49. I think that insofar as the district court dismissed these allegations, that dismissal must be affirmed. "[S]weeping legal conclusions cast in the form of factual allegations" do not suffice to state a claim even at the Rule 12(b)(6) stage. 5A Charles Alan Wright *et al., Federal Practice and Procedure* § 1357 (2d ed. 1990). "While the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice." *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996).

The remainder of the plaintiff's § 251 claim is based on allegations in the original complaint parallel to those in ¶¶ 21 and 22 of the amended complaint set forth above.

[The defendant] [1] has fulfilled orders of other Local Phone Service providers' customers after fulfilling those for its own Local Phone Service providers' customers, [2] has failed to fill a substantial number of orders for other Local Phone Service providers' customers substantially identical in circumstances to its own Local Phone Service customers for whom it has filled orders, and [3] has systematically failed to inform other Local Phone Service providers of the status of their orders with [the defendant] concerning their (the other Local Phone Service providers') customers.

Compl. at ¶ 31.

CLECs' customers' "orders" are doubtless "telecommunications services" within the meaning of the Telecommunications Act. *See* 47 U.S.C. § 153(46) (defining "telecommunications services" to include "the offering of telecommunications for a fee directly to the public"). Delayed and unfulfilled orders of CLECs' customers—if both their existence and their unreasonable discriminatory nature can be established by the plaintiff in the district court—implicate the defendant's duty "not to impose unreasonable or discriminatory conditions or limitations on, the resale of its telecommunications services" under § 251(b)(1) and § 251(c)(4)(B). The allegations in the complaint *also* include facts that would constitute violations of the interconnection agreement between AT&T and the defendant: The agreement states that the defendant "will make available to AT&T . . . the Telecommunications Services (As Defined in the Act) that it provides at retail to its non-carrier subscribers." *Order Approving Interconnection Agreement,* 1997 WL 410707, at *41 (N.Y. Pub. Serv. Comm'n June 13, 1997). Among the services the defendant must provide are "residence orders" and "business orders." *Id.* Any violation of the interconnection agreement thus also arises out of provisions of the agreement that implement § 251.

The majority notes that "section 251 envisions that [the enumerated] duties will be implemented through contracts between . . . carrier[s]." Majority opinion, 305 F.3d at 103. It then observes that interconnection agreements "may [be] *negotiate[d]* . . . without regard to the standards set forth in subsections (b) and (c) of section 251." *Id.* at 103 (quoting 47 U.S.C. § 252(a)(1)) (emphasis in original omitted; emphasis added). From this provision, the majority infers that "Congress envisioned the possibility that the negotiated parts of the interconnection agreement could result in a different set of duties than those defined by the statute," rendering § 251 "superfluous." *Id.* at p. 104. Hence, the majority concludes, no § 207 right of action obtains for violations of § 251.

I hesitate to accept the conclusion that the presence of a partially negotiated in-

terconnection agreement here renders the duties of the defendant enumerated in § 251 "superfluous." Section 252(a)(1), upon which the majority relies, refers only to portions of agreements that are "negotiate[d]." *Id.* But "[a]greements can be formed in two different ways: voluntary negotiation or compulsory arbitration." *Bellsouth Telecommunications Inc. v. MCImetro Access Transmission Servs., Inc.,* 278 F.3d 1223, 1228 (11th Cir.2002). An agreement may further contain a mix of negotiated portions and arbitrated portions. *See* 47 U.S.C. § 252(e)(2)(A) (referring to "portion[s]" of an agreement that are negotiated). Section 252(a)(1) does not cover provisions reached by compulsory arbitration under § 252(b). The interconnection agreement between AT&T and the defendant here was, at least in part, "arrived at through compulsory arbitration." *Order Approving Interconnection Agreement,* 1997 WL 410707, at *1.

Sections of interconnection agreements reached through arbitration, unlike negotiated sections, must contain limitations on the behavior of an ILEC congruent with those contained in § 251. *See Verizon Communications Inc. v. FCC,* 535 U.S. 467, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002); *AT&T Corp. v. Iowa Utils. Bd.,* 525 U.S. 366, 372–73, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999); *U.S. West Communications, Inc. v. Sprint Communications Co.,* 275 F.3d 1241, 1244–45 (10th Cir. 2002); *MCI Telecommunications Corp. v. Bell Atl.-Pa.,* 271 F.3d 491, 500–01 (3d Cir.2001). All interconnection agreements, whether reached by negotiation or arbitration, must be approved by state commissions, 47 U.S.C. § 252(e)(1); *Bellsouth Telecommunications,* 278 F.3d at 1228, but the basis on which they may be rejected differs. A negotiated section of an agreement may be rejected only if it "discriminates against a . . . carrier not a par-

ty to the agreement" or if it "is not consistent with the public interest." 47 U.S.C. § 252(e)(2)(A). An arbitrated section of an agreement, by contrast, may be rejected only on the ground that it "does not meet the requirements of section 251." *Id.* § 252(e)(2)(B).

In the instant case, the New York Public Service Commission (the "Commission"), to determine whether it should reject or endorse the agreement, inquired whether "the *entire* Agreement" met, *inter alia,* "the requirements of § 251." *Order Approving Interconnection Agreement,* 1997 WL 410707, at *1 (emphasis added). The Commission determined that "[p]ursuant to the standard enunciated in § 252(e)(2)(B)"—*i.e.,* the § 251 duties—the interconnection agreement did "not violate the requirements of the Act." *Id.* at *3. The entire interconnection agreement here is thus tied closely to the specific requirements of § 251, even though portions of negotiated agreements may not be in all cases.

Section 207 provides a right of action based on "any act" that a carrier is "required" to do under the Telecommunications Act. 47 U.S.C. §§ 206 & 207. The majority identifies no explicit abrogation of this unequivocal language in the context of duties under § 251. As a practical matter, carriers execute such duties when fulfilling arbitrated portions of interconnection agreements because the latter identify specific means of meeting the general duties enunciated in § 251. Indeed, even the fulfillment of an entirely negotiated agreement *might* also perhaps be construed as being an "act . . . required to be done" by the Telecommunications Act.[1] I am therefore reluctant either to endorse the majority's logic, or to conclude that all interconnection agreements, or only arbitrated portions thereof, should give rise to § 207 rights of action. Absent briefing on

---

1. It is not clear that § 251 duties are entirely

displaced even by negotiated agreements in

practical matters, such as the actual frequency of conflicting duties under § 251 and interconnection agreements, and the difficulty of distinguishing negotiated from arbitrated portions of agreements, I am hesitant to guess at how in practice interconnection agreements interact with the duties specified in § 251, and to avoid a statutory command based on what seem to me to be suppositions.

Although the record does not allow us to determine whether the portions of the agreement allegedly violated here were arbitrated or negotiated, we know that the *entire* agreement fulfilled § 251. The obligations of the defendant contained in the interconnection agreement that the plaintiff alleges have been breached may therefore exist solely because the agreement must conform to the provisions of § 251. Perhaps then the defendant's alleged failure to fulfil the obligations were, under § 206 of the Act, "act[s], matter[s], or thing[s] [in the Telecommunications Act] required to be done [by the Act]" that would, contrary to the majority's conclusion, support a right of action under § 207 of the Act.

I would therefore remand for consideration of this issue in the first instance by the district court. An opinion by the learned district judge, a well-developed factual record, and proper briefing cannot but aid in our resolution of this complex and difficult issue. I therefore respectfully dissent from the majority's disposition of it.

### III.  Section 202

Finally, subject to observations similar to those contained in Section I of this

concurrence about the antitrust claims, I concur with the majority's conclusion as to the plaintiff's claims under § 202 of the Communications Act.

---

all instances. At least one circuit court has concluded that even agreements "negotiated and agreed upon 'with regard' to the 1996 Act and law thereunder," although not arbitrated, may be judicially altered to conform with § 251 and regulations issued thereunder.

*AT&T Communications of the S. States, Inc. v. Bellsouth Telecommunications, Inc.,* 229 F.3d 457, 465 (4th Cir.2000). Not even negotiation, then, necessarily removes an interconnection agreement from § 251's force.