**LAW OFFICES OF CURTIS V. TRINKO, L.L.P., individually and on behalf of all others similarly situated, Plaintiff–Appellant,**

v.

**BELL ATLANTIC CORPORATION, Defendant–Appellee.**

**Docket No. 01–7746.**

United States Court of Appeals, Second Circuit.

Argued: Jan. 10, 2002.

Decided: June 20, 2002.

310

Joseph P. Garland, Klein & Solomon, LLP, New York, NY (Alicia McInerney, Peter S. Linden, Kirby McInerney & Squire, LLP, New York, NY, Kenneth A. Elan, New York, NY, on the brief), for Plaintiff–Appellant.

John Thorne, Verizon Communications, Arlington, Virginia (Richard G. Taranto, Farr & Taranto, Washington, DC, Marc C. Hansen, Aaron M. Panner, Kellogg, Huber, Hansen, Todd & Evans, Washington, DC, Henry B. Gutman, Joseph F. Tringali, Simpson Thacher & Bartlett, New York, NY, on the brief), for Defendant–Appellee.

Before: SACK, KATZMANN, and B.

FLETCHER,* Circuit Judges.

Judge SACK concurs in part and dissents in part in a separate opinion.

KATZMANN, Circuit Judge.

This is an appeal of a dismissal of a class action brought on behalf of a class consisting of customers who received local phone service in the region served by Bell Atlantic from a company other than Bell Atlantic.[1] In recent years, the federal government has changed its policy with respect to the structure of local phone service markets, which had been controlled by state-sanctioned local monopolies. Congress sought to introduce competition to those markets by passing the Telecommunications Act of 1996 (the "Telecommunications Act"), Pub.L. 104–104, 110 Stat. 56, which amended the Communications Act of 1934 (the "Communications Act"), 47 U.S.C. § 151, *et seq.* The Telecommunications Act requires the carrier with the local phone service monopoly to provide competitors with access to its local network—infrastructure necessary to provide local service that is expensive to duplicate. The Telecommunications Act also sets forth procedures by which telecommunications carriers can negotiate an interconnection agreement, which provides for such access, that must ultimately be approved by state regulators.

The plaintiff claims that it was damaged when the defendant, Bell Atlantic, denied the customers of AT & T, the plaintiff's local phone service provider, equal access to its local network. The plaintiff filed an action alleging that this behavior: (1) violated section 202(a) of the Communications Act; (2) violated subsections (b) and (c) of section 251 of the Telecommunications Act;

(3) violated section 2 of the Sherman Antitrust Act (the "Sherman Act"), 15 U.S.C. § 2; and (4) was a tortious interference with contract. The plaintiff sought damages and injunctive relief for the alleged violations of section 202(a) and subsections (b) and (c) of section 251 pursuant to sections 206 and 207 of the Communications Act. It also sought damages and injunctive relief for the alleged violation of section 2 of the Sherman Act pursuant to the Clayton Act, 15 U.S.C. § 15.

The defendant primarily contended and maintains on appeal that the plaintiff's section 202(a) and 251 claims should be dismissed because the plaintiff is not asserting its own rights but is asserting rights that belong to AT & T. The defendant argues that the complaint only alleges a breach of its interconnection agreement with AT & T and that such a breach should be remedied through the administrative process. The defendant claims that allowing an antitrust action based on the plaintiff's allegations would disrupt the regulatory process established by the Telecommunications Act. The district court essentially agreed with these arguments and dismissed the plaintiff's action in its entirety. *See Law Offices of Curtis V. Trinko, LLP v. Bell Atlantic Corp.,* 123 F.Supp.2d 738 (S.D.N.Y.2000).

For the following reasons, we affirm in part, vacate in part, and remand for further proceedings.

BACKGROUND

 We review the district court's decision granting the defendant's motion to dismiss *de novo*, taking all factual allegations in the amended complaint as true and construing all reasonable inferences in fa-

---

* The Honorable Betty Fletcher, Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

1. Bell Atlantic later merged with GTE Corporation to form Verizon Communications.

vor of the plaintiff. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Conboy v. AT & T Corp.*, 241 F.3d 242, 246 (2d Cir.2001).

## I. The Market for Local Phone Service and the Telecommunications Act

Prior to 1982, AT & T had monopolies in the markets for long-distance phone service, local phone service, and telephone equipment. In that year, AT & T settled an antitrust suit by the United States and agreed to a consent decree that split it from its local subsidiaries in order to encourage competition in the long-distance and equipment markets. In contrast, local phone service markets were left in the hands of AT & T's former local subsidiaries, which were regulated as monopolies by the states and prohibited from entering the long-distance markets. The rationale for allowing monopolies in the local phone service market was the belief that having more than one local provider would lead to unwarranted duplication in the physical connecting wires through which local calls are transmitted. *See AT & T Corp. v. Iowa Utils. Board*, 525 U.S. 366, 413–14, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999) (Breyer, J., concurring in part, dissenting in part).

Bell Atlantic and NYNEX were two such providers with monopolies in the local phone service markets. In August 1997, NYNEX merged into Bell Atlantic, creating one company that provides local phone service in New England, New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia, West Virginia, and the District of Columbia. Bell Atlantic controls the "local loop" in its territory. According to the plaintiff, the "local loop is the wireline—a twisted pair of copper wires, coaxial cable, fiber optic cable, or the like—that links the customer's premises to a central switching station," Compl. ¶ 21, from which calls are routed to their ultimate destination. "In plain English, loops are the wires that connect telephones to the switches that direct calls to their destination." *AT & T Corp. v. FCC*, 220 F.3d 607, 618 (D.C.Cir. 2000). The plaintiff alleges that currently a carrier needs access to the "local loop" in order to provide local service because the cost of building a new "local loop" is prohibitively expensive.

Recently, as noted above, national policy with respect to the desirability of allowing competition in the local phone service markets has changed dramatically. In 1996, Congress enacted the Telecommunications Act, which amended the Communications Act. Under the Telecommunications Act, states are no longer permitted to enforce laws that prohibit entry in a local phone service market. *See* 47 U.S.C. § 253(a). Moreover, the amendment imposes affirmative duties on any local phone service provider, or local exchange carrier ("LEC"), that encourage competition by, for example, requiring the LEC to "afford access to the poles, ducts, conduits, and rights-of-way of such carrier to competing providers...." 47 U.S.C. § 251(b)(4). An incumbent local exchange carrier ("ILEC"), which is the carrier such as Bell Atlantic that had a monopoly in the local phone service market prior to the enactment of the Telecommunications Act, *see* 47 U.S.C. § 251(h)(1), has additional affirmative duties under the statute. Among other duties, upon the request by another telecommunications carrier, the ILEC is required to provide interconnection with its network "that is at least equal in quality to that provided by the local exchange carrier to itself...." 47 U.S.C. § 251(c)(2)(C).

The plaintiff subscribed for local phone service with AT & T. Pursuant to the Telecommunications Act, AT & T had requested interconnection with the ILEC in

the area, NYNEX, which later merged into Bell Atlantic. Upon such a request, section 252 of the Telecommunications Act allows the ILEC and requestor to enter into a binding agreement governing the interconnection arrangement that must ultimately be approved by a state commission. AT & T and NYNEX entered into such an agreement, which the state commission approved. *See Order Approving Interconnection Agreement,* Case 96–C–0723, 1997 WL 410707 (N.Y.P.S.C. June 10, 1997). Section 16 of the interconnection agreement provides for dispute resolution procedures that are the "exclusive remedy for all disputes between NYNEX and AT & T arising out of this Agreement or its breach." *Id.* at *23, § 16. The agreement also allows for disputes to be submitted to federal and state regulatory agencies. *Id.*

Shortly after entering into the interconnection agreement, AT & T filed complaints with regulatory authorities concerning lost and delayed orders. On March 9, 2000, Bell Atlantic entered into a consent decree with the FCC, agreeing to resolve the problem promptly and pay $3 million to the United States and $10 million to AT & T and other competitors for their losses. The consent decree was dissolved in July 2000.

## II. The Plaintiff's Action and its Dismissal by the District Court

Not long after the consent decree was entered, the plaintiff filed a complaint in the United States District Court for the Southern District of New York (Sidney H. Stein, J.) asserting multiple actions against Bell Atlantic: (1) an action pursuant to sections 206 and 207 of the Communications Act, alleging that Bell Atlantic violated: (a) section 202(a) of the Communications Act, which prohibits common carriers from discriminating in rates or services in providing communications services and (b) its obligations as an ILEC under subsections (b) and (c) of section 251 of the Telecommunications Act; (2) an action pursuant to the Clayton Act, alleging that Bell Atlantic violated section 2 of the Sherman Act; and (3) a state law claim for tortious interference with contract.

The plaintiff, a limited liability partnership organized under New York law, alleges that Bell Atlantic has not afforded competing local exchange carriers ("CLECs") with equal access to its network. The plaintiff claims that as a result, it has received poor local phone service. The amended complaint alleges:

> Bell Atlantic has not afforded CLECs access to the local loop on a par with its own access. Among other things, Bell Atlantic has filled orders of CLEC customers after fulfilling those for its own local phone service, has failed to fill in a timely manner, or not at all, a substantial number of orders for CLEC customers substantially identical in circumstances to its own local phone service customers for whom it has filled orders on a timely basis, and has systematically failed to inform CLECs of the status of their customers' orders with Bell Atlantic.

Consequently, the plaintiff claims Bell Atlantic violated the various duties imposed on it as an ILEC by subsections (b) and (c) of section 251 of the Telecommunications Act and its duties as a common carrier under section 202(a) of the Communications Act. The amended complaint also alleges that Bell Atlantic's conduct had no valid business reason and was intended to exclude competition from the market "by making it difficult for its competitors to provide service in the Local Phone Service market on the level that Bell Atlantic is

able to provide to its customers in that market." Am. Compl. ¶ 52.

The plaintiff seeks class certification pursuant to Fed.R.Civ.P. 23(b) on behalf of the "customers of a company other than Bell Atlantic with respect to the provision of Local Phone Service in the Geographic Market at any time since March 10, 1996," Am. Compl. ¶ 28, who were damaged by Bell Atlantic's alleged conduct. The plaintiff seeks damages, including treble damages for its antitrust claims. Moreover, the amended complaint asks for injunctive relief "enjoining Bell Atlantic from providing access to the local loop market ... to providers of Local Phone Service other than itself on terms and conditions that are not as favorable as those enjoyed by Bell Atlantic...." Am. Compl. at 16.

Bell Atlantic moved pursuant to Fed. R.Civ.P. 12(b)(6) to dismiss the complaint. The district court granted the motion with respect to the Communications Act and antitrust claims, and declined to retain jurisdiction over the state law claim.

In adjudicating the plaintiff's antitrust claim, the district court in its thorough opinion initially evaluated Bell Atlantic's argument that the plaintiff did not have standing to bring an antitrust action because the only damage it suffered was as an indirect purchaser of services from AT & T. The district court rejected this argument, reasoning that the plaintiff's alleged harm, "damages resulting from poorer service than [it] would otherwise have received had Bell Atlantic acted lawfully, ... is wholly distinct from the harm suffered by [AT & T]." *Trinko*, 123 F.Supp.2d at 741. Although the plaintiff had standing to bring an antitrust action, the district court held that the plaintiff did not sufficiently allege the "willful acquisition or maintenance" of monopoly power by Bell Atlantic. The district court noted that even a monopolist does not have a general duty under the antitrust laws to cooperate

with its competitors. Citing the Seventh Circuit's decision in *Goldwasser v. Ameritech Corp.*, 222 F.3d 390 (7th Cir.2000), the district court observed that "[t]he affirmative duties imposed by the Telecommunications Act are not coterminous with the duty of a monopolist to refrain from exclusionary practices." *Trinko*, 123 F.Supp.2d at 742. Characterizing the plaintiff's claim as solely an allegation that Bell Atlantic violated the Telecommunications Act, the district court found that such an allegation was insufficient to support an antitrust claim.

The district court also dismissed the plaintiff's Communications Act claims. Initially, the district court rejected Bell Atlantic's argument that the damages provisions of the Communications Act do not apply to the Telecommunications Act. The district court concluded that the Telecommunications Act was an amendment to the Communications Act and that private lawsuits are not generally incompatible with the regulatory scheme established by the Telecommunications Act. However, the district court dismissed the claims based on the doctrine of prudential standing, the judge-made rule that prevents a third party from asserting the rights of others. The district court reasoned that section 251 of the Telecommunications Act "imposes duties on incumbent carriers only as to local competitors, and those rights are triggered only when a competing carrier requests interconnection." *Trinko*, 123 F.Supp.2d at 744 (citation omitted). Therefore, a suit brought by the plaintiff alleging violations of section 251 would impermissibly assert the rights of Bell Atlantic's local competitor, AT & T. Similarly, the district court explained that section 202(a) of the Communications Act only imposes duties on a carrier with respect to its own customers. *See id.* Thus, the district court concluded that only Bell Atlantic's customers have a right to bring suit under section 202(a), barring the

plaintiff, which is a customer of AT & T, from bringing suit. The district court dismissed the plaintiff's section 202(a) claim without prejudice, allowing the plaintiff to replead its claim within 20 days. Finally, because the district court dismissed all of the plaintiff's federal claims, it declined to retain supplemental jurisdiction over the plaintiff's state law tortious interference claim.

The plaintiff then moved for reconsideration of the district court's decision. While the district court denied the motion, it allowed the plaintiff to replead its antitrust claim in addition to its section 202(a) claim. In its amended complaint, the plaintiff attempted to retool its section 202(a) claim to avoid the assertion of a third party's rights. The plaintiff alleged that it had a direct relationship with Bell Atlantic because AT & T acted as the plaintiff's agent with respect to Bell Atlantic.[2] The plaintiff also characterized its antitrust claim as a monopoly leveraging claim. Bell Atlantic again filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and the district court granted the motion. The district court rejected the plaintiff's amended section 202(a) claim because the plaintiff failed to allege facts establishing a principal-agent relationship. The district court also concluded that there was no antitrust claim because the amended complaint did not describe anticompetitive conduct and only alleged that Bell Atlantic breached its own contracts with competitors.

The plaintiff filed a timely notice of appeal and this appeal ensued.

## DISCUSSION

### I. The Communications Act Claims

### A. General Principles of Standing

■ We first address the district court's dismissal of the plaintiff's Communications Act claims through application of the prudential standing doctrine. We review a district court's dismissal of a complaint for lack of standing *de novo. See Wight v. Bankamerica Corp.*, 219 F.3d 79, 86 (2d Cir.2000).

■ "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (citation omitted); *accord Lamont v. Woods*, 948 F.2d 825, 829 (2d Cir.1991). Both limits are "founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth*, 422 U.S. at 498, 95 S.Ct. 2197 (citations omitted). The constitutional dimension of the standing doctrine originates from Article III of the Constitution, which confines federal courts to adjudicating "cases" and "controversies." To meet the constitutional test for standing, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (citation omitted).

■ It is undisputed that the plaintiff meets the constitutional limits of standing. The issue is whether the plaintiff satisfies the judge-created prudential requirements of standing. "Foremost among the prudential requirements is the rule that a party must 'assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Wight*, 219 F.3d at 86 (quoting

**2.** The plaintiff did not assert this theory on appeal.

*Warth,* 422 U.S. at 499, 95 S.Ct. 2197). "[T]he source of the plaintiff's claim to relief assumes critical importance with respect to the prudential rules of standing.... Essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth,* 422 U.S. at 500, 95 S.Ct. 2197; *accord Leibovitz v. New York City Transit Auth.,* 252 F.3d 179, 185 (2d Cir.2001). Thus, the issue is whether the plaintiff has a right to judicial relief under sections 206 and 207 of the Communications Act for alleged violations of section 202(a) of the Communications Act and subsections (b) and (c) of section 251 of the Telecommunications Act.

### B. Sections 206 and 207 of the Communications Act

The district court assumed that the plaintiff's rights under the Communications Act could only arise from duties defined by the substantive provisions of the Act. Because the plaintiff could not identify a duty to it arising directly from sections 202(a) or 251, the district court held that the plaintiff was impermissibly attempting to assert the rights of third parties.

In determining whether the plaintiff has a right under the Communications Act, the proper focus is not sections 202(a) or 251, but the Act's liability and damages provisions, sections 206 and 207. The plaintiff's right to bring an action under the Communications Act originates from sections 206 and 207 of that Act. Section 206 makes a common carrier "liable to the person or persons injured" as a result of the common carrier's violation of the Communications Act. 47 U.S.C. § 206.[3] Section 207 gives the person damaged by the common carrier's violation of the Act the right to bring an action in federal court. *See* 47 U.S.C. § 207.[4] Sections 206 and 207 are broadly written and explicitly encompass all of the substantive provisions of the Communications Act. While a particular substantive provision may not provide the plaintiff with a particular right, if the violation of that provision injures the plaintiff, sections 206 and 207 of the Communications Act confer upon the plaintiff the right to bring an action to recover for its injuries.

### C. Section 202(a) of the Communications Act

The plaintiff alleges that the defendant violated section 202(a) of the Communications Act. Section 202(a) provides:

---

**3.** Section 206 provides in full:

In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case.

47 U.S.C. § 206

**4.** Section 207 provides in full:

Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.

47 U.S.C. § 207.

It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

47 U.S.C. § 202(a). "An inquiry into whether a carrier is discriminating in violation of § 202(a) involves a three-step inquiry: (1) whether the services are 'like'; (2) if they are, whether there is a price difference between them; and (3) if there is, whether that difference is reasonable." *Competitive Telecomm. Ass'n v. FCC*, 998 F.2d 1058, 1061 (D.C.Cir.1993); *see also National Communications Ass'n, Inc. v. AT & T*, 238 F.3d 124, 127 (2d Cir.2001) (assuming that this three-step inquiry applies in this Circuit). "[T]he Congressional concern in enacting ... § 202(a) specifically, was to eliminate the use of monopolistic power to stifle competition." *National Communications*, 238 F.3d at 131 (citations omitted).

The discrimination described in the complaint suffices to state a claim under section 202(a). In *National Communications Ass'n, Inc. v. AT & T,* we upheld a finding of discrimination under section 202(a) where a telecommunications carrier favored its own end-user customers over resellers. 238 F.3d 124, 127–28 (2d Cir. 2001). The plaintiff has also alleged that CLECs such as AT & T obtaining services under the resale provisions of § 251 received telecommunications services inferior to those supplied to the defendant's own end-users.

Although the plaintiff alleged a cognizable form of discrimination by the defendant, the district court dismissed the plaintiff's section 202(a) action based on the doctrine of prudential standing. In doing so, the district court assumed that the plaintiff's right to bring suit under the Communications Act originates from section 202(a). While the text of section 202(a) broadly prohibits discrimination against "any particular person, class of persons, or locality," 47 U.S.C. § 202(a), the district court characterized section 202(a) as only creating a duty between a communications provider and its direct customer. The district court concluded that the plaintiff has no action under section 202(a) because it was not a direct customer of Bell Atlantic, and was instead a customer of AT & T, which was a customer of Bell Atlantic. Under the district court's theory, only AT & T would have a section 202(a) action against Bell Atlantic.

But as we explained earlier, the plaintiff's right to sue does not stem from section 202(a). It originates from sections 206 and 207, which makes parties who violate the Communications Act liable to parties they injure through such violations. Bell Atlantic does not dispute on appeal that there is arguably a violation of section 202(a) with respect to its dealings with AT & T. The plaintiff alleges that it was injured by this violation of the Communications Act because it received poor local phone service. As an entity that contends that it was injured by Bell Atlantic's alleged violation of section 202(a), the plaintiff plainly meets the requirements for having an action under sections 206 and 207. The plaintiff is asserting its own rights. Therefore, the district court erred in dismissing the case based on the doctrine of prudential standing.

To support its argument for dismissal, the defendant points to the absence of

published cases involving actions by indirect purchasers allegedly injured by railroad rates that were regulated by the now repealed Interstate Commerce Act ("ICA"). Because "[s]ections 206 and 207 of the Communications Act were expressly modeled on the enforcement provisions of the ICA," this Court has "held that decisions construing the ICA are persuasive in establishing the meaning of the Communications Act...." *Conboy,* 241 F.3d at 250; *see also AT & T Co. v. Central Office Tel., Inc.,* 524 U.S. 214, 222, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998); . H.R.Rep. No. 73–1850, at 6 (1934).[5]

Although we have found no indirect purchaser case brought under the ICA, the defendant does not point to any authority barring such a suit. In light of the unambiguous language of sections 206 and 207, the absence of such a case is insufficient to establish that such an action is not permitted. Moreover, the Supreme Court did state in *L.T. Barringer & Co. v. United States,* 319 U.S. 1, 13, 63 S.Ct. 967, 87 L.Ed. 1171 (1943), that shippers, who tend to be the parties most directly injured by discriminatory rates, were not the only entities that could bring actions for discriminatory rates under the ICA. The discussion in *L.T. Barringer* is consistent with the language of sections 206 and 207, which provides that any party injured by conduct that violates the Communications Act has the right to bring an action.

Bell Atlantic contends that the plaintiff cannot bring suit because its injury is wholly derivative of the injury suffered by AT & T. In the RICO context, it is well-established that a plaintiff must establish that the defendant's conduct was a proximate cause of its injury in order to have standing to bring a RICO action. *See Holmes v. Securities Investor Prot. Corp.,* 503 U.S. 258, 267–70, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); *Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229, 234 (2d Cir.1999). We have noted that "to plead a direct injury is a key element for establishing proximate causation...." *Laborers Local,* 191 F.3d at 235. But we have not held that sections 206 and 207 of the Communications Act contain a requirement of proximate cause. We need not resolve the difficult issue of whether there is such a requirement, however, because on this record the plaintiff sufficiently alleges that it suffered a direct injury. In discussing the question of antitrust standing, the district court found that "[t]he harm that these customers are alleging—damages resulting from poorer service than they would otherwise have received had Bell Atlantic acted lawfully—is wholly distinct from the harm suffered by the competitors." *Trinko,* 123 F.Supp.2d at 741. The plaintiff alleges that it suffered a direct harm, poor phone service, as a result of the defendant's misconduct.[6] While the

---

**5.** Prior to passage of the Communications Act, the communications industry was regulated by the ICA. In 1910, Congress extended regulation to communications common carriers through the Manns Elkins Act, which amended the ICA to bring such carriers under the jurisdiction of the Interstate Commerce Commission. In 1934, the Communications Act created the FCC to regulate the communications industry. *See Iowa Utils. Board,* 525 U.S. at 403–04, 119 S.Ct. 721 (Thomas, J. concurring in part and dissenting in part); Glen O. Robinson, *The Federal Communica-*

*tions Act: An Essay on Origins and Regulatory Purpose,* in A LEGISLATIVE HISTORY OF THE COMMUNICATIONS ACT OF 1934–3, 3 (Max D. Paglin, ed., 1989).

**6.** The defendant contends that the plaintiff essentially describes an overcharge claim, which only resulted in an indirect injury. While the plaintiff's alleged receipt of poor service means that it paid too much for the service it received, the plaintiff's claim for damages cannot be narrowly pigeon-holed into the category of an excessive charge. The

district court may find otherwise after discovery and a motion for summary judgment, it is too early to conclude on this record that the plaintiff only suffered a wholly derivative injury.

Bell Atlantic asserts a number of other arguments for dismissal that the district court did not consider. Specifically, it claimed that the case should be dismissed under the filed rate doctrine and because the plaintiff has not pleaded specific damages. These are grounds that the district court did not address in its decision, which solely relied on the doctrine of prudential standing in dismissing the case, and we will not decide those issues in the first instance on this appeal.

We are of the view that the district court erred in dismissing the plaintiff's

section 202(a) claim based on the doctrine of prudential standing. Because the discrimination described in the complaint would violate section 202(a) of the Communications Act and allegedly caused a direct injury to the plaintiff, the plaintiff is asserting its own rights under sections 206 and 207 of the Communications Act. We therefore reverse the district court's dismissal of the plaintiff's section 202(a) claim based on the doctrine of prudential standing.

## D. Section 251 of the Telecommunications Act

■ The plaintiff's attempt to bring a claim for alleged violations of section 251 of the Telecommunications Act is problematic.[7] We agree that the claim should be

plaintiff contracted for a basic level of adequate service with the expectation that it would receive such service. Instead, the defendant's misconduct allegedly disrupted these expectations, and perhaps damaged the plaintiff's business. Such allegations describe a direct injury.

7. Subsections (a), (b), and (c) of Section 251 read:

§ 251. Interconnection
(a) General duty of telecommunications carriers
Each telecommunications carrier has the duty—
(1) to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers; and
(2) not to install network features, functions, or capabilities that do not comply with the guidelines and standards established pursuant to section 255 or 256 of this title.
(b) Obligations of all local exchange carriers
Each local exchange carrier has the following duties:
(1) Resale
The duty not to prohibit, and not to impose unreasonable or discriminatory conditions or limitations on, the resale of its telecommunications services.
(2) Number portability

The duty to provide, to the extent technically feasible, number portability in accordance with requirements prescribed by the Commission.
(3) Dialing parity
The duty to provide dialing parity to competing providers of telephone exchange service and telephone toll service, and the duty to permit all such providers to have nondiscriminatory access to telephone numbers, operator services, directory assistance, and directory listing, with no unreasonable dialing delays.
(4) Access to rights-of-way
The duty to afford access to the poles, ducts, conduits, and rights-of-way of such carrier to competing providers of telecommunications services on rates, terms, and conditions that are consistent with section 224 of this title.
(5) Reciprocal compensation
The duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications.
(c) Additional obligations of incumbent local exchange carriers
In addition to the duties contained in subsection (b) of this section, each incumbent local exchange carrier has the following duties:
(1) Duty to negotiate
The duty to negotiate in good faith in accordance with section 252 of this title

dismissed but for different reasons than the district court gave.

The plaintiff alleges that the defendant violated its duties as an ILEC as defined by subsections (b) and (c) of section 251 of the Telecommunications Act. Section 251 seeks to open local telecommunications markets to competition. While section 251 establishes a number of broadly stated duties that can be construed as substantive norms of behavior, the Telecommunications Act allows an ILEC to substantially fulfill its duties under subsections (b) and (c) of section 251 by entering into interconnection agreements with telecommunications carriers seeking to enter the local market. These agreements are reached primarily through a process of negotiation and must ultimately be approved by a state commission. The parties may ask the state commission to arbitrate any dis-

the particular terms and conditions of agreements to fulfill the duties described in paragraphs (1) through (5) of subsection (b) of this section and this subsection. The requesting telecommunications carrier also has the duty to negotiate in good faith the terms and conditions of such agreements.

(2) Interconnection

The duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network—

(A) for the transmission and routing of telephone exchange service and exchange access;

(B) at any technically feasible point within the carrier's network;

(C) that is at least equal in quality to that provided by the local exchange carrier to itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection; and

(D) on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title.

(3) Unbundled access

The duty to provide, to any requesting telecommunications carrier for the provision of a telecommunications service, nondiscriminatory access to network elements on an unbundled basis at any technically feasible point on rates, terms, and conditions that are just, reasonable, and nondiscriminatory in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title. An incumbent local exchange carrier shall provide such unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service.

(4) Resale

The duty—

(A) to offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers; and

(B) not to prohibit, and not to impose unreasonable or discriminatory conditions or limitations on, the resale of such telecommunications service, except that a State commission may, consistent with regulations prescribed by the Commission under this section, prohibit a reseller that obtains at wholesale rates a telecommunications service that is available at retail only to a category of subscribers from offering such service to a different category of subscribers.

(5) Notice of changes

The duty to provide reasonable public notice of changes in the information necessary for the transmission and routing of services using that local exchange carrier's facilities or networks, as well as of any other changes that would affect the interoperability of those facilities and networks.

(6) Collocation

The duty to provide, on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, for physical collocation of equipment necessary for interconnection or access to unbundled network elements at the premises of the local exchange carrier, except that the carrier may provide for virtual collocation if the local exchange carrier demonstrates to the State commission that physical collocation is not practical for technical reasons or because of space limitations.

47 U.S.C. §§ 251(a)-(c).

putes that arise in the negotiating process. After the state commission approves such an agreement, the Telecommunications Act intends that the ILEC be governed directly by the specific agreement rather than the general duties described in subsections (b) and (c) of section 251.

In this case, AT & T and Bell Atlantic have negotiated an interconnection agreement. During this process they submitted a number of issues to the state commission for arbitration. Those disputes were resolved and the entire agreement has been approved by the state commission. This agreement provides for a dispute resolution mechanism that the parties have utilized. At best, the plaintiff only describes conduct by the defendant that would violate the interconnection agreement. Therefore, the plaintiff has no cause of action pursuant to sections 206 and 207 of the Communications Act for injury stemming from a violation of section 251.

Initially, we note that the district court was correct in concluding that section 251 defines duties between telecommunications carriers. It is clear that the duties enumerated in section 251 regulate the relationships between telecommunications carriers, especially those that are seeking to enter the market for local phone service, rather than the relationships between telecommunications carriers and consumers. In fact, the Committee Report notes that section 251 "imposes a general duty to interconnect directly or indirectly *between all telecommunications carriers. ...*" H.R. Conf. Rep. 104–458, 1996 WL 46795, at *121 (1996) (emphasis added). While the Telecommunications Act and legislative history often refer to the fact that consumers will ultimately benefit from competitive communications markets, that is only a collateral effect of the implementation of these duties by telecommunications carriers.

It could be argued that if the plaintiff has a right to bring suit for a violation of the Telecommunications Act, such a right would arise from sections 206 and 207 of the Communications Act. On this view, if the plaintiff has such a right, the district court's dismissal of the plaintiff's section 251 claim based on the doctrine of prudential standing would have been in error. However, we need not reach the issue of whether the plaintiff has the right under sections 206 and 207 to bring suit for a violation of the Telecommunications Act because the plaintiff does not describe conduct by the defendant that would violate section 251 of the Telecommunications Act.

While the duties regulating ILECs enumerated in subsections (b) and (c) of section 251 appear at first glance to be freestanding, in practice, section 251 envisions that these duties will be implemented through state approved contracts between the carrier requesting interconnection and the ILEC. Section 251 requires the ILEC and requesting carrier to "negotiate in good faith in accordance with section 252 ... agreements to fulfill the duties described in paragraphs (1) through (5) of subsection (b) of this section and this subsection." 47 U.S.C. § 251(c)(1). In other words, an ILEC can meet its obligations under subsections (b) and (c) by entering into an interconnection agreement with a requesting carrier through the procedures outlined in section 252. Such interconnection agreements do not necessarily reiterate the duties enumerated in section 251. Instead, the ILEC and requesting carrier have the option of contracting around the obligations set forth in subsections (b) and (c) of section 251. Section 252(a)(1) of the Telecommunications Act provides: "[u]pon receiving a request for interconnection, services, or network elements pursuant to section 251 of this title, an incumbent local exchange carrier may negotiate and enter

into a binding agreement with the requesting telecommunications carrier or carriers *without regard to the standards set forth in subsections (b) and (c) of section 251. . . .*" 47 U.S.C. § 252(a)(1) (emphasis added).

Section 252 also provides for regulation of interconnection agreements by state commissions. For example, if there are disputes in the negotiation of an interconnection agreement, the parties can request arbitration by the state commission to decide any open issues. *See* 47 U.S.C. § 252(b)(1). The state commission is required to resolve such disputes through reference to section 251. *See* 47 U.S.C. § 252(c)(1). The state commission must also ultimately approve the interconnection agreement. In evaluating parts of an interconnection agreement for approval, the statute requires the state commission to use different criteria depending on whether the portion of the agreement was negotiated or arbitrated. The state commission may only reject negotiated portions of an interconnection agreement if they discriminate against a non-party telecommunications carrier or if the implementation of the agreement goes against the public interest. *See* 47 U.S.C. § 252(e)(2)(A). On the other hand, when parts of the interconnection agreement go through the arbitration procedure, the state commission may only reject an arbitrated portion of the agreement if it does not comply with section 251. *See* 47 U.S.C. § 252(e)(2)(B).

NYNEX, which later merged with Bell Atlantic to form the defendant, and AT & T used the procedures described in section 252 to enter into an interconnection agreement that was ultimately approved by the state. Because they disagreed on a number of issues, the parties submitted certain disputes to the New York Public Service Commission for arbitration. *See* Order Approving Interconnection Agreement,

1997 WL 410707, at *1. The New York Public Service Commission resolved the disputes and ultimately approved the agreement as compliant with section 251 and consistent with the public interest. *See id.* at *4.

 The issue before us is whether conduct that breaches the defendant's interconnection agreement with AT & T can also be considered a violation of subsections (b) and (c) of section 251. We conclude that in this case it does not. Once the ILEC "fulfill[s] the duties" enumerated in subsection (b) and (c) by entering into an interconnection agreement in accordance with section 252, 47 U.S.C. § 251(c)(1), it is then regulated directly by the interconnection agreement. Moreover, the fact that the Telecommunications Act allows parties to negotiate interconnection agreements without regard to subsections (b) and (c) of section 251, *see* 47 U.S.C. § 252(a)(1), indicates that Congress envisioned the possibility that the negotiated parts of the interconnection agreement could result in a different set of duties than those defined by the statute. To read the Telecommunications Act in a way such that ILECs are governed exclusively by the broadly worded language of section 251 would make the option of negotiating interconnection agreements without regard to subsections (b) and (c) of section 251 superfluous.

The elaborate process of negotiation and arbitration set forth in section 252 indicates that Congress sought to allow ILECs and their competitors to govern their interconnection relationships directly through specific interconnection agreements rather than the broadly outlined duties described in subsections (b) and (c) of section 251. Interconnection agreements are necessary because the particular ways in which the broadly framed duties enumerated in section 251 are im-

plemented may differ depending on the circumstances. Rather than primarily regulating the relationships between entering carriers and the incumbent ILEC through abstract duties enforceable in court, Congress chose to give the parties the option to negotiate particular agreements with the aid and ultimate approval of state regulatory bodies, which have specialized expertise in the area of telecommunications. This option offers telecommunications carriers the choice to use a regulatory process that might be more efficient than other alternatives. If ILECs were governed by the abstract duties described in section 251 despite the existence of a particular interconnection agreement that was approved by the state commission after an extensive process of negotiation and arbitration, they would have diminished incentive to enter into such agreements. A requesting carrier could end-run the carefully negotiated language in the interconnection agreement by bringing a lawsuit based on the generic language of section 251.[8]

The particular interconnection agreement entered into by the defendant and AT & T requires the parties to resolve any disputes through procedures set forth in the agreement. We take judicial notice of the fact that the dispute between Bell Atlantic and AT & T arising out of the factual allegations in the complaint has been resolved through these procedures. The defendant fulfilled its duties as an ILEC under subsections (b) and (c) of section 251 by entering into a state approved interconnection agreement with AT & T through the procedures described in section 252. While the defendant may have breached its obligations under the interconnection agreement, because its duties as an ILEC are directly defined by that agreement, there was no underlying violation of subsections (b) and (c) of section 251.[9] Without an underlying violation of section 251, the plaintiff has no cause of action under sections 206 and 207, even if it were permitted to bring a suit for violations of section 251 pursuant to sections 206 and 207.[10]

## II. The Antitrust Claim

Finally, we address the district court's dismissal of the plaintiff's antitrust claim. We agree that the plaintiff has standing to

8. Because the interconnection agreement in this case is closely linked to section 251 of the Telecommunications Act, the dissent argues that the defendant's failure to fulfill its obligations under the agreement may also support a right of action under 47 U.S.C. §§ 206 & 207, which may provide a right of action for violations of the Telecommunications Act. While it is true that the New York Public Service Commission found that the interconnection agreement in this case "does not violate the requirements of the Act," this finding was "subject to clarifications discussed below [in the text of the Commission's Order Approving Interconnection Agreement]." See *Order Approving Interconnection Agreement,* 1997 WL 410707, at *3. The Commission's language confirms that the particular form of the duties defined by the interconnection agreement in this case do not simply reiterate the general duties imposed by section 251.

9. The complaint does not allege that Bell Atlantic violated subsection (a) of section 251. Moreover, subsection (a) only requires basic interconnection and compatibility of standards. The complaint does not describe conduct by Bell Atlantic that would violate these duties.

10. We stress that because this is a case where an interconnection agreement has been entered into by the parties and approved by the state, we do not decide whether a plaintiff can bring suit for a violation of the duties under section 251 when there is no such agreement. Moreover, we emphasize that our analysis is limited to section 251 of the Telecommunications Act and does not address other provisions of that Act.

bring an antitrust claim. However, we reverse the district court's dismissal of the plaintiff's antitrust claim pursuant to Fed. R.Civ.P. 12(b)(6).

## A. Standing

■ Initially, we review the district court's conclusion that the plaintiff has standing to bring an antitrust suit. The Clayton Act provides an action for "any person ... injured in his business or property by reason of anything forbidden in the antitrust laws...." 15 U.S.C. § 15. To have standing to bring an action under the Clayton Act, the plaintiff must show "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Volvo N. Am. Corp. v. Men's Inter. Prof'l Tennis Council*, 857 F.2d 55, 66 (2d Cir.1988) (internal quotations and citations omitted).

The plaintiff alleges that it received poor local phone service because of Bell Atlantic's attempt to maintain its monopoly power by refusing to provide equal access to its local network. The defendant asserts that the plaintiff has no antitrust standing because it only suffered an indirect injury. According to the defendant, its alleged actions only directly injured its direct customer, AT & T. The plaintiff could only have been injured incidentally, through its purchase of inferior services from AT & T. The defendant thus contends that the plaintiff is essentially an indirect purchaser who cannot recover antitrust damages under *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), which held that a customer of a customer who is overcharged by a monopolist does not have antitrust standing. The rationale for the *Illinois Brick* rule is that it is difficult to calculate the damages suffered by an indirect purchaser. *See id.* at 737–47, 97 S.Ct. 2061. The indirect purchaser is only damaged to the extent that the direct purchaser passes on to it the overcharge resulting from the anticompetitive conduct. Any such calculation would be imprecise and could result in double recovery if both the direct and indirect purchasers sue and the calculations in their suits differed.

The problem with simply applying the *Illinois Brick* rule to this case is that AT & T cannot be characterized solely as a customer of Bell Atlantic. While AT & T purchases access to the local network from Bell Atlantic, it is also a competitor of Bell Atlantic in the retail market for selling local phone service to consumers. Consequently, this is a case where the anticompetitive conduct has allegedly damaged the customer of a competitor who would have antitrust standing under *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). In *McCready*, the Supreme Court found that an individual who was denied coverage for treatment by a psychologist as a result of an alleged conspiracy between his health plan and a group of psychiatrists had antitrust standing. The defendants in that case alleged that the conspiracy only injured the competitors of the psychiatrists, the psychologists. The Supreme Court, however, found that a customer of a competitor can suffer a direct injury from an anticompetitive scheme aimed principally at the competitor. To illustrate this principle, the Supreme Court used a simple example. As a result of the scheme to exclude psychologists from the market, the person seeking coverage for treatment by a psychologist has two choices: (1) visit a psychologist and not receive reimbursement; or (2) visit a psychiatrist. While the second choice hurts the psychologist in its role as a competitor of psychiatrists, the first choice directly hurts the customer of the psychologist. *See McCready*, 457 U.S. at 483–84, 102 S.Ct. 2540. Similarly,

as a result of the alleged monopoly scheme, the plaintiff in this case had a similar set of choices: (1) stay with AT & T and receive inferior local service; or (2) switch to Bell Atlantic. While the second choice would hurt AT & T as a competitor, the first choice directly injures the plaintiff as a consumer. In this case, the plaintiff made the first choice and suffered the requisite antitrust injury.

The defendants in *Illinois Brick* were alleged price-fixers. *Illinois Brick* assumes a case where customers and customers of customers are only affected by the anticompetitive scheme through the imposition of prices higher than prices in a competitive market. In such a case, the only harm suffered by the customer of the customer is that part of the higher prices are passed on to it. In this case, Bell Atlantic was not simply charging higher prices, it was also allegedly trying to interfere with AT & T's opportunity to compete with it. Thus, there is more at stake here than the imposition of higher prices, which are indirectly passed on to others. There is allegedly conduct that is meant to drive a competitor out of the market. Action meant to injure a competitor can directly harm the consumer who chooses to do business with the competitor. In this case, allegedly the plaintiff was harmed directly when it received poor phone service because it chose to do business with AT & T.

The district court correctly concluded that the plaintiff has antitrust standing.

## B. The Sherman Act Claim

 Generally, a plaintiff can establish that a defendant violates section 2 of the Sherman Act by proving two elements "(1) the possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a superior product,

business acumen, or historic accident." *Volvo N. Am. Corp.*, 857 F.2d at 73 (citations omitted); *accord Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97 (2d Cir.1998).

The district court dismissed the plaintiff's antitrust claim, finding that the plaintiff did not state a claim with respect to the second element. The district court reasoned that a monopolist does not have a general duty to cooperate with its competitors. Relying on *Goldwasser v. Ameritech Corp.*, 222 F.3d 390 (7th Cir.2000), the district court concluded that at most the plaintiff had only alleged that the defendant breached section 251 of the Telecommunications Act.

 While it is true that a monopolist has no general duty to cooperate with its competitors, "[a] monopolist may not, of course, use its market power, whether obtained lawfully or not, to prevent or impede competition in the relevant market." *United States Football League v. National Football League*, 842 F.2d 1335, 1360–61 (2d Cir.1988) (citations omitted). As the Supreme Court has explained:

> [t]he absence of an unqualified duty to cooperate does not mean that every time a firm declines to participate in a particular cooperative venture, that decision may not have evidentiary significance, or that it may not give rise to liability in certain circumstances. The absence of a duty to transact business with another firm is, in some respects, merely the counterpart of the independent businessman's cherished right to select his customers and his associates. The high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified.

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). For example,

a monopolist has a duty to provide competitors with reasonable access to "essential facilities," facilities under the monopolist's control and without which one cannot effectively compete in a given market. *See Southern Pac. Communications Co. v. AT & T,* 740 F.2d 980, 1009 (D.C.Cir.1984) ("access to essential facilities [must] be afforded to competitors 'upon such just and reasonable terms and regulations as will, in respect of use, character and cost of service, place every such company upon as nearly an equal plane as may be with respect to expenses and charges as that occupied by the proprietary companies.'") (quoting *United States v. Terminal R.R. Assoc.,* 224 U.S. 383, 411, 32 S.Ct. 507, 56 L.Ed. 810 (1912)); *see also Twin Labs., Inc. v. Weider Health & Fitness,* 900 F.2d 566, 568–69 (2d Cir.1990) (discussing essential facilities theory).

While it is clear that a plaintiff would not state an antitrust claim against a defendant simply by alleging that the defendant violated its duties under section 251, the plaintiff's antitrust claim does not merely allege that the defendant violated section 251. In fact, it does not mention section 251 at all. The allegations in the amended complaint describe conduct that may support an antitrust claim under a number of theories. While some of this conduct might also violate section 251, these are not merely allegations that section 251 has been violated.

■ First, the amended complaint may state a claim under the "essential facilities" doctrine. The plaintiff alleges that access to the local loop is essential to competing in the local phone service mar-ket, and that creating independent facilities would be prohibitively expensive. The defendant allegedly has failed to provide reasonable access to these facilities. Although the defendant may ultimately be able to show that the local loop is not an essential facility, or that it provided the plaintiff with reasonable access to the local loop, these are issues of fact that cannot be resolved on this motion to dismiss.

■ Second, the plaintiff may have a monopoly leveraging claim. To have such a claim, the plaintiff must show that the defendant "(1) possessed monopoly power in one market; (2) used that power to gain a competitive advantage ... in another distinct market; and (3) caused injury by such anticompetitive conduct." *Virgin Atl. Airways v. British Airways,* 257 F.3d 256, 272 (2d Cir.2001). The amended complaint alleges that the defendant has monopoly power over a wholesale market in which it sells access to the local loop to telecommunications carriers. It also alleges that the defendant used that power to gain a competitive advantage in a retail market in which telecommunications carriers sell local phone service to consumers. *See, e.g., M.A.P. Oil Co. v. Texaco, Inc.,* 691 F.2d 1303, 1307 (9th Cir.1982) (noting that distinct customers and distinct prices are factors useful in identifying a distinct market) (citing *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). Finally, the plaintiff alleges that it was injured by this anticompetitive conduct. Again, the defendant ultimately may be able to refute these claims on summary judgment, but we cannot resolve them on the merits at this stage of the litigation.[11]

---

11. The plaintiff has also asserted an attempted monopolization claim. To establish such a claim, a plaintiff must show that the defendant "(1) engaged in anticompetitive or predatory conduct with (2) specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *AD/SAT v. Associated Press,* 181 F.3d 216, 226 (2d Cir. 1999). This claim is derivative of the monopoly leveraging and essential facilities claims. If the plaintiff demonstrates that the defendant engaged in monopoly leveraging, or de-

In *Goldwasser*, the Seventh Circuit dismissed similar allegations of monopolistic conduct for two reasons. First, it found that the claim was "inextricably linked" to allegations by the *Goldwasser* plaintiff that section 251 of the Telecommunications Act had been violated. Thus, the claim was merely an allegation that the Telecommunications Act was violated and not a freestanding antitrust action. But there is no requirement that an allegation that otherwise states an antitrust claim must not rely on allegations that might also state a claim under another statute. Congress, of course, can indicate that such a statute provides an implicit immunity from the antitrust laws. Conduct that merely describes a violation of a statute that is meant to immunize a regulated industry from antitrust scrutiny could not support an antitrust action. But we do not lightly find that a statute provides such an implicit immunity. Absent a "plain repugnancy," we will not assume that a regulatory statute implicitly repeals the antitrust laws. *See Northeastern Tel. Co. v. AT & T*, 651 F.2d 76, 82–83 (2d Cir.1981). If there is no such implicit immunity, as long as a set of allegations states an antitrust action on its own terms, the fact that it closely resembles an action brought under another statute in itself is unproblematic.

There is no "plain repugnancy" between the antitrust laws and the Telecommunications Act. In fact, the purpose of the Act is to "provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition...." H.R. Cong. Rep. 104–458, 1996 WL 46795, at *1 (1996); 1A PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW 162–63 (2000) ("The 1996 [Telecommunications] Act goes very far toward throwing all aspects of the industry open to competition and thus antitrust analysis."). Moreover, the Act contains a specific savings clause, which specifies that "nothing in this Act or the amendments made by this Act ... shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws." 47 U.S.C. § 152, Historical and Statutory Notes. The meaning of the statutory provision is plain on its face and must guide our analysis. *See Lebron v. Russo*, 263 F.3d 38, 41 (2d Cir.2001) (per curiam). The savings clause unambiguously establishes that there is no "plain repugnancy" between the Telecommunications Act and the antitrust statutes. We thus find that the Telecommunications Act does not provide an "implicit immunity" from the antitrust laws.[12]

nied it reasonable access to an essential facility, then it has established the first element of the attempted monopolization claim that the defendant engaged in anticompetitive behavior. Based on our reading of the amended complaint, however, the plaintiff does not describe any additional predatory or anticompetitive conduct that would establish the first prong of an attempted monopolization claim. While on remand, the plaintiff may add allegations that would describe additional predatory behavior, at this point, the plaintiff has not established a separate attempted monopolization claim.

12. Citing Justice Breyer's partial concurrence and partial dissent in *AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. at 428–29, 119 S.Ct. 721, the defendant generally asserts that duties requiring sharing of infrastructure may actually reduce competition. But Justice Breyer's point was made in the context of an argument for applying an "essential facilities" standard to the sharing requirements of the Telecommunications Act. Justice Breyer only contended that sharing might reduce competition when the sharing involved a resource that was not an "essential facility." Thus, this analysis does not apply when the sharing in-

■ The *Goldwasser* court's conclusion also rested on the assumption that "[t]he antitrust laws would add nothing to the oversight already available under the 1996 law." *Goldwasser*, 222 F.3d at 401. But in this case, which involves an individual consumer seeking damages, the antitrust laws serve an important role. One of the purposes of the Clayton Act is "to compensate victims of antitrust violations for their injuries." *Illinois Brick Co.*, 431 U.S. at 746, 97 S.Ct. 2061 (citation omitted). Because this plaintiff has no remedy under the Telecommunications Act for a violation of subsections (b) and (c) of section 251, the antitrust laws are the only place where it has a remedy for damage caused by the allegedly anticompetitive behavior described in the amended complaint. Thus, in this case, the antitrust laws serve the purpose of affording the consumer compensation that the Telecommunications Act does not provide.

■ The second reason the *Goldwasser* court gave for dismissing the suit was that allowing an antitrust suit based on allegations arising out of the alleged refusal of an ILEC to grant an LEC equal access to its network "would . . . force us to confront the question whether the procedures established under the 1996 Act for achieving competitive markets are compatible with the procedures that would be used to accomplish the same result under the antitrust laws." *Goldwasser*, 222 F.3d at 401. *Goldwasser* raises the issue of whether the Telecommunications Act is "specific legislation that must take precedence over the general antitrust laws, where the two are covering precisely the same field." *Id.*

But the Telecommunications Act, while meant to create significant change in a market, is not unprecedented as a legislative attempt to open markets to competi-

tion. In *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), the Supreme Court held that the antitrust laws apply to at least one other industry regulated by a statute that was intended to encourage competition in the industry. In reviewing a finding of antitrust liability against an electric utility company for its refusal to sell energy at a wholesale price to competing providers, the Supreme Court evaluated the utility's argument that it was not subject to antitrust regulation because of the Federal Power Act. The Court noted that the Act embodied "an overriding policy of maintaining competition to the maximum extent possible consistent with the public interest." *Id.* at 374, 93 S.Ct. 1022. To achieve this end, section 202 of the Federal Power Act not only encouraged voluntary interconnections of power but also gave the Federal Power Commission the power to order interconnections. *Id.* at 373, 93 S.Ct. 1022. Although the regulatory process envisioned by the Federal Power Act may not have been as complex and comprehensive as the procedures enumerated in the Telecommunications Act, the statutes have similar purposes. And despite a specific regulatory structure that was meant to encourage competition through interconnection, the Court found that the Federal Power Act did not preclude an antitrust suit against the regulated utility. Thus, controlling case law does not support the theory that specific legislation meant to encourage competition necessarily takes precedence over the general antitrust laws.

It is unlikely that allowing antitrust suits would substantially disrupt the regulatory proceedings mandated by the Telecommunications Act. In discussing the impact such suits would have on the regulatory process, it is useful to discuss

volves an "essential facility," which the plain-

tiff alleges to be the case here.

separately suits seeking damages and suits for injunctive relief. Awarding damages for the willful maintenance of monopoly power would not substantially interfere with the regulatory scheme envisioned by the Telecommunications Act. In contrast, injunctive relief in this area may have ramifications that require particular judicial restraint.

While allowing damages actions would mean that ILECs would to some extent be subject to both the antitrust laws and their interconnection agreements, the defendant points to no specific areas where the two sets of obligations would conflict.[13] The defendant contends that its conduct should only be viewed as a breach of its interconnection agreement with AT & T that should exclusively be remedied by the regulatory process. However, there is no authority for the proposition that entering into an interconnection agreement exempts a telecommunications carrier from the antitrust laws.[14] To the contrary, if the defendant's conduct did violate the antitrust laws, the fact that the regulatory commission also condemned the conduct of the

defendant may indicate that the purposes of the two schemes are in synch, reinforcing our conclusion that there is no "plain repugnancy" between the statutes. As the plaintiff points out, the breach of such an agreement may in some cases be a means by which the ILEC improperly excludes competition from the market. In this case, the main difference in the two frameworks is that AT & T may seek remedy through the regulatory process while the consumer may seek remedy under the antitrust laws. The two schemes complement rather than contradict each other.

While ideally, the regulatory process alone would be enough to bring competition to the local phone service markets,[15] it is possible that the antitrust laws will be needed to supplement the regulatory scheme, especially with respect to injury caused to consumers. *See Reiter v. Sonotone Corp.,* 442 U.S. 330, 344, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) ("private [antitrust] suits provide a significant supplement to ... enforc[ement] [of] the antitrust laws and deterring violations.").[16]

**13.** Under section 252, an ILEC could theoretically negotiate an interconnection agreement that defined its duties in a way that conflicts with subsections (b) and (c) of section 251. *See* 47 U.S.C. § 252(a)(1). But the defendant has not contended that this particular interconnection agreement conflicts with principles of antitrust law. Moreover, it seems unlikely to us that the LEC entering the market would agree to an interconnection agreement that would in some way reduce competition in the market by restricting the LEC's access to the local loop. If such a conflict were to arise, the state regulatory commission would resolve the dispute, using section 251 as a guideline. *See* 47 U.S.C. § 252(c)(1).

**14.** In contrast, there is specific statutory authority that the negotiation of such an agreement fulfills the telecommunication carrier's duties under subsections (b) and (c) of section 251. *See* 47 U.S.C. § 251(c)(1).

**15.** The defendant cites *Town of Concord v. Boston Edison Co.,* 915 F.2d 17 (1st Cir.1990),

an opinion written by Justice Breyer when he was a circuit judge, for the general proposition that regulation inherently reduces the risk of antitrust harm. *Town of Concord,* however, must be read in light of its particular context, a claim alleging a price squeeze in the public utilities industry where regulators had the authority to maintain prices at "reasonable" levels. *Id.* at 25–26. The subject matter of this litigation focuses on the issue of equal access to networks. On this appeal from an order granting a motion to dismiss, we cannot assess the effectiveness of regulation in this industry. In contrast, *Town of Concord* was an appeal after a jury trial where the First Circuit had a complete record to make this determination.

**16.** We note that this is an action brought by an injured consumer and not an LEC. Our decision does not address whether LECs seeking to enter the market may ever bring antitrust suits against the ILEC. In this case, we note that the interconnection agreement re-

Moreover, at this stage, the record does not allow us to conclude that the regulatory process has successfully eliminated the risk of anticompetitive behavior in this particular market. There has been no discovery and the evidence has not been developed with respect to this issue.

Additionally, courts are suited to the task of assessing the extent of damages allegedly caused by unlawful behavior. Damages can be tailored to award one-time relief to retroactively compensate individuals for injuries caused by past misconduct. The award of such damages would not substantially interfere with the broader regulatory process. *See, e.g., Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 222, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966) (noting that award of treble antitrust damages would not interfere with future action by regulatory agency).

On the other hand, the possibility of injunctive relief in this case may be more problematic than an award of damages. Courts may not be suited to order particular actions by telecommunications carriers to make the local markets more competitive, particularly when there is a specific regulatory scheme meant to serve the same purpose. An overly broad injunction might interfere with the regulatory framework. But this is not a reason to dismiss the suit at this stage, especially because the plaintiff may no longer be asserting claims for injunctive relief. The possibility

of an injunction that conflicts with the regulatory framework will not be an issue until the end of the litigation if there is a finding of liability. It is possible that court intervention could be appropriate in some limited circumstances. However, courts must be both mindful and wary of the strong possibility that injunctive relief could have the unintended consequence of disrupting the regulatory scheme. We have confidence that courts will exercise their discretion with restraint in any case where such relief is appropriate, consistent with respect for the overarching regulatory regime that Congress has created.

Therefore, we reverse the district court's dismissal of the plaintiff's antitrust claim.

### CONCLUSION

For the reasons stated above, we affirm the district court's dismissal of the plaintiff's section 251 claim. The judgment of the district court is vacated with respect to its dismissal of the plaintiff's other claims, and the case is remanded for further proceedings consistent with this opinion.

SACK, Circuit Judge, concurring in part and dissenting in part.

I concur with the majority's resolution of the plaintiff's appeal with respect to its claims under § 2 of the Sherman Act and § 202 of the Communications Act. I write

---

quires the parties to the agreement to resolve their disputes through arbitration and the administrative process. *See Order Approving Interconnection Agreement*, 1997 WL 410707, at *23, § 16.

We also note that the Telecommunications Act provides telecommunications carriers with incentives to negotiate interconnection agreements and utilize the regulatory process. ILECs who wish to enter the long distance market are required to meet certain requirements. Some of those requirements can be

met by successfully negotiating an interconnection agreement. *See* 47 U.S.C. § 271(c)(2)(A)(i)(I). The LEC may have the incentive to proceed through negotiating such an agreement because the regulatory process is likely to provide access to the local network sooner than the court system. Thus, we do not believe that allowing antitrust actions by injured consumers to proceed will necessarily cause telecommunications carriers to avoid the regulatory process.

briefly and separately to make an observation as to these. I respectfully dissent, however, with regard to the majority's disposition of the appeal of the dismissal of the plaintiff's claim under § 251 of the Telecommunications Act, which I would remand to the district court for further consideration.

## I. The Sherman Act Claim

I concur with the majority's disposition of the appeal with respect to the antitrust claim. I write separately to emphasize the extent to which, in my view, the procedural posture of the case may influence the outcome of this appeal.

The plaintiff alleges in its amended complaint that:

> Throughout the [relevant p]eriod, [the defendant] has not afforded [competing local exchange carriers ("CLECs")] access to the local loop on a par with its own access. Among other things, [the defendant] [1] has filled orders of CLEC customers after filling those for its own local phone service, [2] has failed to fill in a timely manner, or not [sic] at all, a substantial number of orders for CLEC customers substantially identical in circumstances to its own local phone service customers for whom it has filled orders on a timely basis, and [3] has systematically failed to inform CLECs of the status of their customers' orders with [the defendant].

Am. Compl. at ¶ 21. The plaintiff further alleges:

> On March 9, 2000, after Plaintiff retained counsel to investigate and pursue its claim, [the defendant] agreed to pay a $3 million fine to the U.S. Treasury pursuant to a consent decree entered into between [the defendant] and the Federal Communications Commission arising out of [the defendant's] failure to provide adequate access to Local Phone Service competitors in New York to the level required when the Federal Communications Commission allowed [the defendant] to offer long-distance telephone service to New Yorkers and to pay $10 million in compensation to competing Local Phone Service providers in New York for injury caused to them as a result of [the defendant's] misconduct in handling orders from such competing Local Phone Service providers.

Am. Compl. at ¶ 22. Elsewhere in its amended complaint, the plaintiff asserts that the defendant's conduct injured it. Am. Compl. ¶ 23.

Additionally, in its original complaint, in connection with its allegations concerning Section 251 of the Telecommunications Act, the plaintiff made allegations, parallel to those contained in ¶¶ 21 and 22 of the amended complaint, Compl. ¶¶ 31, 32, consisting of quotations of "obligations" imposed on incumbent local exchange carriers ("ILECs") under the Act, and assertions that the defendant did not fulfil these "obligations."

The defendant responds, however, that this litigation is about only a single sequence of events referred to in the third clause of paragraph 21 and in paragraph 22 of the amended complaint and similar allegations in the original complaint. As the defendant describes these events:

> In the weeks that followed the approval of the New York long-distance application, [the defendant] encountered a problem with the computer systems it adopted (the "operation support systems" or "OSS") to satisfy the regulators' demands during the long-distance-approval process. The problem affected the ability of competitors who had placed orders with [the defendant] to receive an electric confirmation notification that their orders were being pro-

cessed. AT & T and others immediately filed complaints with the FCC and with the New York PSC. On March 9, 2000, the defendant entered a consent decree with the FCC resolving the matter by ensuring prompt cure of the problem and payment of $3 million to the United States and $10 million to AT & T and other competitors for their losses.... Just a few months later, in July 2000, with the problem fixed, the FCC dissolved the consent decree.

Appellee's Br. at 9; *see also In the Matter of Bell Atlantic*, 15 F.C.C.R. 5413, 2000 WL 571154 (2000) (consent decree).

The defendant thus insists that this case concerns a computer malfunction that led to a failure to confirm orders by AT & T to the defendant, and no more. The defendant further underscores the fact that it has already paid ten million dollars to CLECs, including AT & T, to compensate them for the injury that they suffered as a result, and $3 million to the FCC as a sanction for any misconduct for which the defendant is responsible. If indeed the plaintiff's claim rests only on the order confirmation failure, and the evidence shows that service lapses were temporary and a consequence of technical flaws alone, it may be that summary judgment will ultimately be available to the defendant on the Sherman Act claim. Evidence of service lapses, absent other indicia of predatory conduct, may not be enough to establish an attempt to injure competition or gain a competitive advantage.

But the district court dismissed the complaint under Fed.R.Civ.P. 12(b)(6) for "failure to state a claim upon which relief can be granted," and it is premature to conclude that the plaintiff cannot establish that the failure to provide prompt order confirmations was not a technical problem, but rather an attempt to fend off competition in the local service market from AT &

T or other CLECs. It is also too early to be sure that the plaintiff cannot establish that, independent of confirmation delays, the defendant delayed filling orders of CLECs' customers, but not those of its own customers, or failed to fill orders for CLECs' customers at all, thus injuring competition or gaining a competitive advantage, as the plaintiff also alleges. Should the plaintiff be able to establish the existence of such circumstances, I see no bar to its Sherman Act claim.

Upon a Rule 12(b)(6) motion, dismissal is not warranted unless "no relief could be granted under *any* set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (emphasis added); *accord In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69 (2d Cir. 2001). Relief can be awarded in this case under a set of facts consistent with the allegations in the complaint, even if the existence of those facts may seem somewhat doubtful.

II. Section 251 of the Telecommunications Act .

I find the majority's approach to the plaintiff's § 251 claim, majority opinion, ante at 319–23, generally well thought out and well articulated, and agree that the district court's resolution of the issue was erroneous. But the ground on which the majority affirms the judgment of the district court is different from that relied upon by the district court and those discussed by the parties on appeal. As far as I can determine, moreover, no other circuit has considered this precise question. Especially in light of the fact that the plaintiff's other claims are being returned to the district court, I would return the § 251 claim for further exposition by the parties and consideration by that court.

The § 251 claim is set forth only in the plaintiff's original complaint. As noted previously, part of the plaintiff's pleading in this regard is a verbatim recitation of the defendant's "[o]bligations [as a] local exchange carrier[ ]" under § 251(b), and its "[a]dditional obligations [as an] incumbent local exchange carrier[ ]" under § 251(c). Compl. at ¶¶ 45–49. I think that insofar as the district court dismissed these allegations, that dismissal must be affirmed. "[S]weeping legal conclusions cast in the form of factual allegations" do not suffice to state a claim even at the Rule 12(b)(6) stage. 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (2d ed.1990). "While the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice." *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996).

The remainder of the plaintiff's § 251 claim is based on allegations in the original complaint parallel to those in §§ 21 and 22 of the amended complaint set forth above.

[The defendant] [1] has fulfilled orders of other Local Phone Service providers' customers after fulfilling those for its own Local Phone Service providers' customers, [2] has failed to fill a substantial number of orders for other Local Phone Service providers' customers substantially identical in circumstances to its own Local Phone Service customers for whom it has filled orders, and [3] has systematically failed to inform other Local Phone Service providers of the status of their orders with [the defendant] concerning their (the other Local Phone Service providers') customers.

Compl. at ¶ 31.

CLECs' customers' "orders" are doubtless "telecommunications services" within the meaning of the Telecommunications Act. *See* 47 U.S.C. § 153(46) (defining "telecommunications services" to include

"the offering of telecommunications for a fee directly to the public"). Delayed and unfulfilled orders of CLECs' customers—if both their existence and their unreasonable discriminatory nature can be established by the plaintiff in the district court—implicate the defendant's duty "not to impose unreasonable or discriminatory conditions or limitations on, the resale of its telecommunications services" under § 251(b)(1) and § 251(c)(4)(B). The allegations in the complaint *also* include facts that would constitute violations of the interconnection agreement between AT & T and the defendant: The agreement states that the defendant "will make available to AT & T ... the Telecommunications Services (As Defined in the Act) that it provides at retail to its non-carrier subscribers." *Order Approving Interconnection Agreement,* 1997 WL 410707, at *41 (N.Y. Pub. Serv. Comm'n June 13, 1997). Among the services the defendant must provide are "residence orders" and "business orders." *Id.* Any violation of the interconnection agreement thus also arises out of provisions of the agreement that implement § 251.

The majority notes that "section 251 envisions that [the enumerated] duties will be implemented through contracts between ... carrier[s]." Majority opinion, ante at 321. It then observes that interconnection agreements "may [be] *negotiate[d]* ... without regard to the standards set forth in subsections (b) and (c) of section 251." Majority opinion, ante at 321 (quoting 47 U.S.C. § 252(a)(1)) (emphasis in original omitted; emphasis added). From this provision, the majority infers that "Congress envisioned the possibility that the negotiated parts of the interconnection agreement could result in a different set of duties than those defined by the statute," rendering § 251 "superfluous." Majority opinion, ante at 322–23. Hence, the ma-

334

jority concludes, no § 207 right of action obtains for violations of § 251.

I hesitate to accept the conclusion that the presence of a partially negotiated interconnection agreement here renders the duties of the defendant enumerated in § 251 "superfluous." Section 252(a)(1), upon which the majority relies, refers only to portions of agreements that are "negotiate[d]." *Id.* But "[a]greements can be formed in two different ways: voluntary negotiation or compulsory arbitration." *Bellsouth Telecommunications Inc. v. MCImetro Access Transmission Servs., Inc.,* 278 F.3d 1223, 1228 (11th Cir.2002). An agreement may further contain a mix of negotiated portions and arbitrated portions. *See* 47 U.S.C. § 252(e)(2)(A) (referring to "portion[s]" of an agreement that are negotiated). Section 252(a)(1) does not cover provisions reached by compulsory arbitration under § 252(b). The interconnection agreement between AT & T and the defendant here was, at least in part, "arrived at through compulsory arbitration." *Order Approving Interconnection Agreement,* 1997 WL 410707, at *1.

Sections of interconnection agreements reached through arbitration, unlike negotiated sections, must contain limitations on the behavior of an ILEC congruent with those contained in § 251. *See Verizon Communications, Inc. v. FCC,* —— U.S. ——, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002); *AT & T Corp. v. Iowa Utils. Bd.,* 525 U.S. 366, 372–73, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999); *U.S. West Communications, Inc. v. Sprint Communications Co.,* 275 F.3d 1241, 1244–45 (10th Cir. 2002); *MCI Telecommunication Corp. v. Bell Atl.–Pa.,* 271 F.3d 491, 500–01 (3d Cir.2001). All interconnection agreements, whether reached by negotiation or arbitration, must be approved by state commissions, 47 U.S.C. § 252(e)(1); *Bellsouth*

*Telecommunications,* 278 F.3d at 1228, but the basis on which they may be rejected differs. A negotiated section of an agreement may be rejected only if it "discriminates against a . . . carrier not a party to the agreement" or if it "is not consistent with the public interest." 47 U.S.C. § 252(e)(2)(A). An arbitrated section of an agreement, by contrast, may be rejected only on the ground that it "does not meet the requirements of section 251." *Id.* § 252(e)(2)(B).

In the instant case, the New York Public Service Commission (the "Commission"), to determine whether it should reject or endorse the agreement, inquired whether "the *entire* Agreement" met, *inter alia,* "the requirements of § 251." *Order Approving Interconnection Agreement,* 1997 WL 410707, at *1 (emphasis added). The Commission determined that "[p]ursuant to the standard enunciated in § 252(e)(2)(B)"—*i.e.,* the § 251 duties—the interconnection agreement did "not violate the requirements of the Act." *Id.* at *3. The entire interconnection agreement here is thus tied closely to the specific requirements of § 251, even though portions of negotiated agreements may not be in all cases.

Section 207 provides a right of action based on "any act" that a carrier is "required" to do. 47 U.S.C. §§ 206 & 207. The majority identifies no explicit abrogation of this unequivocal language in the context of duties under § 251. As a practical matter, carriers execute such duties when fulfilling arbitrated portions of interconnection agreements because the latter identify specific means of meeting the general duties enunciated in § 251. Indeed, even the fulfillment of an entirely negotiated agreement *might* also perhaps be construed as being an "act . . . required to be

done" by the Act.[1] I am therefore reluctant either to endorse the majority's logic, or to conclude that all interconnection agreements, or only arbitrated portions thereof, should give rise to § 207 rights of action. Absent briefing on practical matters, such as the actual frequency of conflicting duties under § 251 and interconnection agreements, and the difficulty of distinguishing negotiated from arbitrated portions of agreements, I am hesitant to guess at how in practice interconnection agreements interact with the duties specified in § 251, and to avoid a statutory command based on what seem to me to be suppositions.

Although the record does not allow us to determine whether portions of the agreement allegedly violated here were arbitrated or negotiated, we know that the *entire* agreement fulfilled § 251. The obligations of the defendant contained in the interconnection agreement that the plaintiff alleges have been breached may therefore exist solely because the agreement must conform to the provisions of § 251. Perhaps then the defendant's alleged failure to fulfil the obligations were, under § 206 of the Act, "act[s], matter[s], or thing[s] [in the Telecommunications Act] required to be done [by the Act]" that would, contrary to the majority's conclusion, support a right of action under § 207 of the Act.

I would therefore remand for consideration of this issue in the first instance by the district court. An opinion by the learned district judge, a well-developed factual record, and proper briefing cannot but aid in our resolution of this complex and difficult issue. I therefore respectfully dissent from the majority's disposition of it.

III. Section 202

Finally, subject to observations similar to those contained in Section I of this concurrence about the antitrust claims, I concur with the majority's conclusion as to the plaintiff's claims under § 202 of the Communications Act.

---

**1.** It is not clear that § 251 duties are entirely displaced even by negotiated agreements in all instances. At least one circuit court has concluded that even agreements "negotiated and agreed upon 'with regard' to the 1996 Act and law thereunder," although not arbitrated, may be judicially altered to conform with § 251 and regulations issued thereunder. *AT & T Communications of the S. States, Inc. v. Bellsouth Telecommunications, Inc.,* 229 F.3d 457, 465 (4th Cir.2000). Not even negotiation, then, necessarily removes an interconnection agreement from § 251's force.